914 So.2d 372 (2004)
Willie Dorrell MINOR
v.
STATE of Alabama.
CR-00-1300.
Court of Criminal Appeals of Alabama.
August 27, 2004.
Rehearing Denied October 22, 2004.
Certiorari Denied May 27, 2005.
*383 Cynthia Helene Bockman, Tuscaloosa; and L. Dan Turberville, Mobile, for appellant.
William H. Pryor, Jr., and Troy King, attys. gen., and Anne C. Adams, asst. atty. gen., for appellee.
Alabama Supreme Court 1040162.
SHAW, Judge.
In July 1995, Willie Dorrell Minor was indicted for capital murder of a child less than 14 years of age, a violation of § 13A-5-40(a)(15), Ala.Code 1975. In June 1996, a jury found Minor guilty of capital murder as charged in the indictment, and in July 1996, that same jury, by a vote of 12-0, recommended that Minor be sentenced to death. The trial court accepted the jury's recommendation and sentenced Minor to death. On appeal, this Court affirmed Minor's conviction and sentence. See Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999). However, the Alabama Supreme Court reversed our judgment, holding that the trial court's failure to instruct the jury that evidence of Minor's prior convictions could be used only for impeachment purposes and not as substantive evidence of Minor's guilt constituted plain error. See Ex parte Minor, 780 So.2d 796 (Ala.2000).
In January 2001, Minor was tried a second time. Once again, a jury found him guilty of capital murder as charged in the indictment. By a vote of 10-2, the jury recommended that Minor be sentenced to death, and the trial court again accepted the jury's recommendation and sentenced Minor to death. From this conviction and sentence, Minor appeals.
The evidence adduced at the second trial indicated the following. A few minutes after 11:00 p.m. on April 15, 1995, Minor and his then girlfriend, Lakeisha Jennings, brought their two-month-old son, Ebious Jennings, to the emergency room at Druid City Hospital ("DCH") in Tuscaloosa. Ebious was not breathing, and he had no pulse when he arrived. Resuscitation efforts began immediately and continued for over an hour. However, medical personnel were unable to maintain a heartbeat for more than a few seconds at a time and *384 Ebious was pronounced dead at 12:34 a.m. on April 16, 1995.
Dr. Steve Lovelady and Dr. Perry Lovely, emergency physicians at DCH, and Dr. Ashley Evans, a pediatrician at DCH, treated Ebious when he was brought to the emergency room. Dr. Lovelady testified that when Ebious was first brought in, he initially thought that Ebious was septic or was the victim of Sudden Infant Death Syndrome, but that after taking X-rays and performing blood work and other medical procedures, he thought Ebious may have been the victim of abuse. Although there was no visible bruising on Ebious and he did not appear to be bleeding externally, he suffered multiple posterior rib fractures, i.e., on the back near the spine, on both sides of his body, as well as a skull fracture. According to Dr. Lovelady and Dr. Lovely, it would take a tremendous amount of force to fracture the bones of an infant because an infant's bones are malleable and pliable and would "tend to bend rather than break." (R. 886.) In addition, Ebious was bleeding into his abdomen because of injuries to his internal organs, and he had suffered a significant amount of blood loss. Ebious also had severe hemorrhaging in both retinas which, Dr. Lovelady testified, indicated that Ebious had been severely shaken and that he suffered from shaken baby syndrome.
Dr. Evans testified that, in her opinion, Ebious was the victim of shaken impact syndrome, i.e., a variant of shaken baby syndrome that is a combination of severe shaking and blunt force. According to Dr. Evans, Ebious had suffered three distinct traumas. First, Dr. Evans concurred with Dr. Lovelady's assessment that the hemorrhaging in Ebious's retinas and the rib fractures indicated that Ebious had been severely shaken. Second, Dr. Evans testified that the skull fracture was caused by some type of impact trauma to the head as a result of "extreme force." (R. 1295.) Finally, Dr. Evans testified that Ebious's abdominal bleeding was caused by a "forceful blow" to the abdomen. (R. 1293.)
Dr. Lovelady, Dr. Lovely, and Dr. Evans all described Ebious's injuries as severe. Dr. Lovelady testified that Ebious's injuries were the most severe he had ever seen in an infant. Dr. Lovely testified that such multiple bone fractures as were seen in Ebious would normally occur only if a child had been thrown a great distance from a motor vehicle as the result of a high-speed collision. Dr. Evans testified that the hemorrhaging in Ebious's retinas caused by shaking was the most severe she had ever seen. Dr. Lovelady and Dr. Lovely also rejected the idea that Ebious's injuries could have been caused by falling off a sofa or having his head accidentally hit on a doorframe as someone was carrying him through the doorway.
Dr. Kenneth Warner, a medical examiner with the Alabama Department of Forensic Sciences in 1995, performed an autopsy on Ebious on April 17, 1995. Dr. Warner testified that Ebious had 24 rib fractures and a skull fracture; that his left lung, his spleen, and his liver had been lacerated; that he had blood in his chest and abdominal cavities as well as his testicles; and that there was "extensive" blood in his brain. (R. 1426.) Dr. Warner testified that the cause of Ebious's death was trauma to the head and chest. Dr. Richard Powers, a neuropathologist and professor at the University of Alabama at Birmingham ("UAB"), examined Ebious's brain after his death. According to Dr. Powers, there was substantial bleeding and bruising of the brain, indicating that there had been "serious movement of the brain from side to side and perhaps also in the front to back." (R. 1166.) Dr. Powers described the injuries to Ebious's brain as "severe" and stated that, in his opinion, *385 those injuries could not have resulted from falling off a sofa. (R. 1167.)
There was no real dispute at trial that Ebious was the victim of shaken impact syndrome  that he had been severely shaken and beaten. There was also no dispute as to the extent of Ebious's injuries or that Ebious died as a result of those injuries. The only real issue was who had caused Ebious's injuries. The State's theory of the case was that Minor had shaken and beaten Ebious while Minor was alone with Ebious on the night of April 15, 1995. The defense theory was that Lakeisha had shaken and beaten Ebious while she was alone with him at some point during the day on April 15, 1995. Because both Minor and Lakeisha had been alone with Ebious at different points in time on the day of his death, the key question to determining who had inflicted the injuries was when Ebious sustained his injuries.
The State presented testimony indicating that Ebious was a healthy baby boy up until the night of his death. Dr. Elizabeth Cockrum, a pediatrician at Capstone Medical Center, testified that she examined Ebious approximately three to four hours after his birth on February 13, 1995, when he was one day old, and again when he was two days old. According to Dr. Cockrum, Ebious had a "positive Coombs" test, which indicated that he may develop jaundice, but everything else was normal in each examination. (R. 916.) At his two-week checkup on February 27, 1995, and at his two-month checkup on April 13, 1995, only three days before his death, Ebious was found to be healthy and developing normally; he was even described as "thriving." (R. 992.) Dorothy Jennings Richardson, Ebious's maternal great-grandmother and a former licensed practical nurse, testified that she saw Ebious between 5:00 p.m. and 6:00 p.m. on the evening of April 15, 1995. Richardson said that she held Ebious at that time and that he appeared to be fine. Diana Pitts, Ebious's maternal grandmother, testified that she saw Ebious between 8:00 p.m. and 9:00 p.m. on the night of April 15, 1995, and that he appeared to be fine at that time as well.
Lakeisha Jennings testified that she was at home in her apartment, which she shared with Minor, all day on April 15, 1995, with Ebious and her other two children; that Minor was gone most of the day; and that Minor returned home at approximately 6:30 p.m. Lakeisha testified that at some point during the day Ebious had fallen off the sofa, but that he did not appear to have been injured from the fall  she said that after the fall, she fed him and saw him smile. At approximately 9:30 p.m. on the night of April 15, 1995, Lakeisha said, she left her apartment and went to her mother's apartment in the same apartment complex. She left Minor alone with Ebious and her other two children. Lakeisha said that Ebious was fine when she left. It is not clear exactly what time Lakeisha returned home, but it appears that she returned sometime between 10:15 p.m. and 10:30 p.m. A few minutes after she returned home, Lakeisha said, she noticed that Ebious's eyes were half open and that he was not breathing. Lakeisha telephoned her mother, who then came over, and they took Ebious to DCH. Lakeisha said that, as she was walking out the front door to go to the hospital, she bumped her elbow on the door frame, but she denied that she bumped Ebious's head on the door frame.
The State presented testimony from several people who saw Minor and Lakeisha at the hospital the night of Ebious's death. Their testimony indicated that despite Ebious's critical condition, Minor was not crying and did not appear upset, while Lakeisha *386 was crying uncontrollably to the point of being unable to speak. The State also presented evidence regarding three statements Minor made to police. In the first two statements, Minor denied any knowledge of the cause of or involvement in Ebious's death. In his third statement, however, Minor told police that he had been holding Ebious and talking on the telephone and tripped and fell on top of Ebious. Minor claimed that he was intoxicated at the time and that he did not intend to injure Ebious.
Finally, the State presented testimony from several physicians regarding when Ebious's injuries occurred. Dr. Lovely testified that based on Ebious's condition when he arrived at the emergency room, he believed that Ebious's injuries had occurred within one to two hours of his being brought to the emergency room, i.e., between 9:00 p.m. and 10:00 p.m. Dr. Powers testified that due to their severity, the injuries to Ebious's brain would have become "clinically apparent very rapidly," i.e., symptoms, including fussiness, drowsiness, and refusal to feed, would have manifested themselves within a short period after the injuries had occurred. (R. 1173.) In addition, Dr. Powers stated that Ebious's brain was not very swollen when he examined it, which, he said, indicated that Ebious did not survive for a "prolonged period of time" after the injuries occurred (R. 1176); specifically, Dr. Powers stated that Ebious's brain did not have "the appearance of a brain of a baby ... who had been hurt twelve, eight hours prior to" death. (R. 1175.) Dr. James Downs, chief medical examiner for the Alabama Department of Forensic Sciences, testified that, based on his review of the autopsy report and Ebious's medical records, he believed that Ebious's injuries were inflicted within one hour of Ebious's arrival at the emergency room, i.e., sometime after 10:00 p.m.
Minor presented testimony from several witnesses indicating that they saw Lakeisha after Ebious's death  anywhere from one day to three weeks after his death  and that she was smiling and laughing and appeared as if nothing had happened. Minor also attempted to explain away his statement to police in which he admitted that he fell on top of Ebious. Although Minor did not testify at the guilt phase of the trial, through cross-examination of State's witnesses, Minor's counsel elicited testimony that Minor had recanted his statement the day after it was made and claimed that Minor had made the statement only because he had been promised that he could get out on bond if he said that he had accidentally injured Ebious. In addition, Minor presented testimony from Dr. Charles V. Wetli, chief medical examiner for Suffolk County, New York, and Dr. Kamal Nagi, a forensic psychiatrist at Taylor Hardin Secure Medical Facility and a former pathologist. Both Dr. Wetli and Dr. Nagi testified, in contrast to the opinions of the State's experts, that they believed that Ebious's injuries had been inflicted several hours, anywhere from six to eight hours, before Ebious arrived at the emergency room, i.e., before Minor got home that evening and while Lakeisha was alone with Ebious.
On appeal, Minor raises 11 issues, many of which he did not raise by objection in the trial court. Because Minor was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Rule 45A, Ala.R.App.P., provides:

*387 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that the "`plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Minor contends that the trial court erred in denying his motion to suppress the statements he made to police because, he says, the statements were not voluntary. (Issues VI and IX in Minor's brief.)
The record reflects that Minor initially spoke with police at the hospital in the early morning hours of April 16, 1995, approximately 30 minutes after Ebious's death. At the request of investigators, Minor then went to the Tuscaloosa County Homicide Unit on April 17, 1995, and spoke with them a second time. After this statement, Minor was arrested and was transported to the county jail. While in the patrol car on the way to the jail, Minor made several unsolicited comments. On June 12, 1995, at his own request, Minor gave a third statement to police.[1] In all of his statements except the June 12 statement, Minor denied any knowledge of Ebious's injuries and he denied killing Ebious. In the June 12 statement, however, Minor admitted to injuring Ebious, but he claimed it was accidental. Minor initially said that when he and Lakeisha noticed that Ebious was not breathing, he "mash[ed Ebious] pretty hard in the rib area" and shook Ebious "a couple of times" in an attempt to resuscitate him. (C. 437-38.) However, he changed his story later during the interview and said that he was holding Ebious while talking on the telephone and that he tripped and fell on top on Ebious. After he fell, Minor said, he picked Ebious up, pushed on his chest, and shook him to make sure he was all right. Minor maintained that he was "drunk and high" at the time and that he did not intend to harm Ebious. (C. 449.)
*388 In his brief on appeal, Minor challenges the April 16 statement, the comments he made in the patrol car after his arrest on April 17, and the June 12 statement; however, he does not challenge the statement he made to police on April 17 before his arrest.[2]
"It is well established that extrajudicial confessions and other inculpatory statements are prima facie involuntary and that for such a statement or confession to be admissible the State must prove by a preponderance of the evidence that it was voluntary." Ex parte Price, 725 So.2d 1063, 1067 (Ala.1998). To prove voluntariness, the State must establish that the defendant "made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him." Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App.1988). "The test for the voluntariness of an extrajudicial confession or an inculpatory statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either expressed or implied, that would have produced in the mind of the accused any fear of harm or hope of favor." Ex parte Jackson, 836 So.2d 979, 982-83 (Ala.2002). For a statement resulting from custodial interrogation to be admissible, the State must also establish that the defendant was properly advised of, and voluntarily waived, his Miranda rights.[3] See Ex parte Johnson, 620 So.2d 709 (Ala.1993), and Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002). "If the defendant is not advised of [his Miranda] rights before being questioned [in a custodial setting], then any statement he makes during the questioning is not admissible against him as evidence of guilt." Ex parte Price, 725 So.2d at 1067. "When determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession." Carroll v. State, 852 So.2d 801, 809 (Ala.Crim.App.1999), aff'd in pertinent part, remanded on other grounds, 852 So.2d 821 (Ala.2001), on return to remand, 852 So.2d 830 (Ala.Crim.App.2001), rev'd, 852 So.2d 833 (Ala.2002).
"The question of whether a confession was voluntary is initially to be determined by the trial court." Jackson v. State, 562 So.2d 1373, 1381 (Ala.Crim.App.1990). "The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence." Dixon v. State, 588 So.2d 903, 907 (Ala.1991). "`In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley v. State, 494 So.2d 750, 760-61 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986). "[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court.... Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal." Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993).

*389 A.
First, Minor contends that the April 16 statement was involuntary "due to [his] state of mind and emotional condition." (Minor's brief at p. 36.)
At the suppression hearing and at trial, Stanley Bush, an investigator with the Tuscaloosa County Homicide Unit, testified that he interviewed Minor at DCH for approximately 35-40 minutes shortly after Ebious's death. According to Inv. Bush, he was trying to ascertain the circumstances leading up to Ebious's death. Because Minor was not a suspect when the interview began, he did not advise Minor of his Miranda rights. At some point during the interview, Inv. Bush learned that Minor had been alone with Ebious shortly before Ebious had been brought to the hospital; at that point, Inv. Bush said, Minor became a suspect, and he advised Minor of his Miranda rights; after being so advised, Minor continued speaking with him. Inv. Bush said that he did not threaten or coerce Minor into making a statement; that he did not offer Minor any hope of reward for making a statement; and that he did not tell Minor that it would be better for him if he made a statement or worse for him if he did not make a statement. Inv. Bush testified that Minor appeared "withdrawn" during the interview, as if he were "focusing on something else." (R. 1571.) In addition, Inv. Bush testified that Minor "seemed impaired" in that his speech was "somewhat slurred" and he was "lethargic in his actions." (R. 111-12.) However, Inv. Bush said that Minor was coherent and that nothing Minor said or did indicated that Minor did not know where he was, what he was doing, or to whom he was speaking. The record reflects that Minor smoked marijuana sometime during the day on April 15, 1995, but there is no indication what time he smoked the marijuana or how much marijuana he smoked.
Minor testified at the suppression hearing that he remembered speaking with Inv. Bush at the hospital shortly after Ebious's death. Minor said that he was upset about the death of his son when he spoke with Inv. Bush and that he was nervous because he thought the police believed that he had injured Ebious. In addition, Minor said that he felt like he had to speak with Inv. Bush and that he was not free to leave.[4] Minor did not testify about whether he was intoxicated or impaired at the time of the statement.
"`Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity' so as to render a statement inadmissible." Callahan v. State, 557 So.2d 1292, 1300 (Ala.Crim.App.), aff'd, 557 So.2d 1311 (Ala.1989), quoting Sullivan v. Alabama, 666 F.2d 478, 483 (11th Cir.1982). See also Quinlivan v. State, 627 So.2d 1082, 1086 (Ala. *390 Crim.App.1992) ("The appellant's emotional condition may have made the statement `unreliable,' but it did not make it `involuntary.'"), and Charles W. Gamble, McElroy's Alabama Evidence § 200.14(1) (5th ed. 1996) ("The fact, without more, that accused was to some extent mentally incapacitated does not render the confession inadmissible." (footnote omitted)). An accused's mental and emotional state is but one factor to be considered when reviewing the totality of the circumstances surrounding an extrajudicial statement. See, e.g., Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000). In addition, "unless intoxication, in and of itself, so impairs a defendant's mind that he is `unconscious of the meaning of his words,' the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession." Carr v. State, 545 So.2d 820, 824 (Ala.Crim.App.1989).
After considering the totality of the circumstances, we conclude that Minor's statement to police on April 16 was voluntary. Although the statement was taken approximately 30 minutes after Ebious's death and Minor was upset and nervous and appeared withdrawn, there is no indication in the record that Minor's emotional state was such that he was unable to comprehend what was going on. In addition, while there is evidence indicating that Minor smoked marijuana at some point on April 15, 1995, and Inv. Bush testified that Minor "seemed impaired" when he gave the April 16 statement, nothing in the record suggests that Minor was so intoxicated and impaired that he did not fully appreciate the situation. Therefore, we find no error in the trial court's denial of Minor's motion to suppress his April 16 statement.

B.
Minor also contends that the statements he made after his arrest, i.e., the remarks he made in the patrol car on the way to the jail on April 17 and the statement he made on June 12, were "`fruit of the poisonous tree'" and should have been suppressed because, he says, his arrest was illegal. (Minor's brief at p. 58.) Specifically, Minor argues that the warrant for his arrest was supported by a "bare bones" affidavit that, he says, was insufficient to establish probable cause. (Minor's brief at p. 54.) Minor did not challenge the legality of his arrest in his motion to suppress, at the suppression hearing, or at any point during his trial. Therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
On appeal after his first trial, Minor raised this same challenge to the legality of his arrest. This Court held that although the affidavit in support of the arrest warrant was insufficient, there was probable cause to arrest Minor without a warrant and that, therefore, his arrest was legal and his post-arrest statements were properly admitted into evidence. See Minor, 780 So.2d at 732-34. We adhere to this holding, and we find no error, plain or otherwise, in the admission of Minor's post-arrest statements.

C.
Finally, Minor contends that the June 12 statement was involuntary and thus inadmissible because, he says, the statement was the result of improper inducement. (Minor's brief at p. 36.) According to Minor, Inv. Bush improperly induced him to make the statement by telling him that "if the death was an accident it might be different regarding bond." (Minor's brief at p. 25.)
The June 12 statement was the result of Minor's request to speak with an investigator regarding Ebious's death. At the suppression *391 hearing, Inv. Bush testified that on June 12 he received a message from Minor, who at the time was in the county jail, requesting to speak with him, and he went to the jail to speak with Minor. When he arrived, Inv. Bush said, he advised Minor of his Miranda rights and Minor indicated that he understood those rights and signed a waiver-of-rights form. Inv. Bush initially spoke with Minor at the jail; however, during that conversation, Inv. Bush said, Minor asked for his help and said that he would explain what happened to Ebious if Inv. Bush would contact his mother.[5] At that point, Inv. Bush contacted Minor's mother and then transported Minor to the Tuscaloosa County Homicide Unit, where Minor continued with the statement.[6]
Inv. Bush testified that he did not threaten or coerce Minor; that he did not offer any hope of reward to Minor for making a statement; and that he did not tell Minor that it would be better for him if he made a statement or worse for him if he did not make a statement. Inv. Bush denied leading Minor to believe that if he admitted hurting Ebious accidentally that it would be easier for him, or that he would be released on bond or that he would not be indicted for capital murder. Inv. Bush testified that he simply told Minor that if Minor said it was an accident, he would inform the district attorney's office of that statement.
Minor testified at the suppression hearing that Inv. Bush informed him of his Miranda rights at the county jail on June 12; that he understood those rights; and that he voluntarily waived those rights and agreed to talk with Inv. Bush. Minor stated that Inv. Bush told him that if he said Ebious's injuries were accidental, Inv. Bush would get the district attorney to reduce the charge from capital murder to manslaughter so that Minor could be released on bond. It was at that point, Minor said, that he gave the statement to Inv. Bush saying that he accidentally fell while he was holding Ebious.
The audiotape of the initial portion of the interview at the jail contains no indication that Inv. Bush ever promised Minor that the charge would be reduced; rather, on the tape, Inv. Bush specifically told Minor that he could not make any promises. The transcript of the latter portion of the interview reflects that after Minor was transported to the Tuscaloosa County Homicide Unit on June 12, he asked Inv. Bush if he could have the charges dropped or be released on bond so that he could go home and see his family. Inv. Bush told Minor that it was "out of [his] control." (C. 437.) Minor then asked Inv. Bush if he would still be charged "if something was an accident." (C. 437.) Inv. Bush then told Minor:
"[I]f you're saying that what happened to Ebious is an accident, then that's going to be up, that's, that's out of my control too now. That's going to be up to, to the District Attorney's Office and from where they decide to go from there as far as possibly grand jury. You know, that's, that's gonna be up to them."
(C. 437.) Later in the interview, Minor said that Inv. Bush had told him previously *392 that he would be charged with capital murder whether Ebious's death was accidental or intentional, to which Inv. Bush replied:
"That's not what I said. I told you that if it comes out to an accident, that I would tell the district attorney about it and then it'd be the district attorney's ball, it would be in his court then. As to what they decide to do."
(C. 442.) The audiotape and the transcript also reflect that Inv. Bush asked Minor several times during the interview if he had dropped Ebious while he was alone with him and Minor said that he had not. Minor's admission that he had fallen on Ebious came toward the end of the interview, after a discussion between him and Inv. Bush about telling the truth. The audiotape and the transcript reflect that Inv. Bush repeatedly told Minor throughout the interview that all he wanted from Minor was the truth, that he could not make Minor any promises, and that all he could do was inform the district attorney's office about what Minor had said.
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut], 367 U.S. [568,] 602, 81 S.Ct. [1860,] 1879, 6 L.Ed.2d 1037 [(1961),] the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added [in McLeod]).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added [in McLeod])....
"....
"... Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See [Ex parte] Gaddy, 698 So.2d [1150,] 1154 [(Ala.1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, *393 we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted [in McLeod])."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).
"Moreover, we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In United States v. Nash, 910 F.2d 749, 752-53 (11th Cir.1990), the United States Court of Appeals for the Eleventh Circuit held:
"`We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally "fared better time-wise," this statement did not amount to an illegal inducement: "telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government."'
"(Quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978)). Accord United States v. Levy, 955 F.2d 1098, 1105 (7th Cir.1992) (holding that federal agent's indication to defendant that his cooperation would be reported to the United States Attorney did not make defendant's confession involuntary); United States v. Meirovitz, 918 F.2d 1376, 1380 (8th Cir.1990) (holding that confession was voluntary although agents had promised to inform prosecutor of defendant's cooperation); United States v. Guerrero, 847 F.2d 1363 (9th Cir.1988) (holding that agent's promise to inform prosecutor of defendant's cooperation does not render a subsequent confession involuntary); United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir.1985) (holding that an officer's promise to bring defendant's cooperation to the attention of the prosecutor did not make confession involuntary)."
718 So.2d at 730-31 n. 4.
After considering the totality of the circumstances, we conclude that Minor's June 12 statement to Inv. Bush was voluntary. Minor initiated the contact with Inv. Bush and admitted at the suppression hearing that he understood and that he voluntarily waived his Miranda rights. Minor had had prior experience with the criminal justice system[7] and there is no indication in the record that he was under the influence of alcohol or narcotics at the time of the June 12 statement. In addition, Minor was the first person to ask about being released on bond, not only during the June 12 interview, but also in prior interviews as well. Specifically, the record reflects that immediately after he was informed on April 17 that he was being arrested, Minor asked if he would be released on bond. On the way to the jail on April 17, Minor again asked if he would be released bond. Inv. Bush's testimony, the audiotape of the initial portion of the June 12 interview at the jail, and the transcript of the latter portion of the June 12 statement at the *394 Tuscaloosa County Homicide Unit all indicate that Minor was the first person on that day to mention the possibility of having the charge against him dropped or being released on bond if Ebious's death was accidental. Inv. Bush repeatedly told Minor during the June 12 interview that he could make no promises to Minor, but that he would inform the district attorney's office of anything Minor said.
Although Minor testified at the suppression hearing that Inv. Bush promised him that he would be released on bond if he said that Ebious's death was an accident, Inv. Bush denied making any such statement. As noted above, in reviewing a trial court's ruling on a motion to suppress, this Court must make all reasonable inferences and credibility choices in favor of the trial court's ruling.
"`"[C]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court." Atwell v. State, 594 So.2d 202, 212 (Ala.Cr.App.1991), cert. denied, 594 So.2d 214 (Ala.1992). "[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion." Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App.1991) (citations omitted).'
"Rutledge [v. State], 651 So.2d [1141,] 1144-45 [(Ala.Crim.App.1994)].
"`Although a promise of leniency or reward undermines the voluntariness of a confession, see Holmes v. State, 598 So.2d 24 (Ala.Cr.App.1992); Campbell v. State, 574 So.2d 937 (Ala.Cr.App.1990), when the evidence regarding whether a promise was made is in conflict, the trial court must make a credibility determination. "Absent clear error, the [circuit] court's credibility choices at suppression hearings are binding on this court." Walker v. State, 551 So.2d 449, 451 (Ala.Cr.App.1989). The standard on review of conflicting evidence at a motion to suppress a confession is whether the trial court's finding was "manifestly contrary to the great weight of the evidence." Ex parte Matthews, 601 So.2d 52 (Ala.1992), cert. denied, [505] U.S. [1206], 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See also Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985) (whether the finding was "palpably contrary to the weight of the evidence").'
"Thompson v. State, 611 So.2d 476, 478 (Ala.Crim.App.1992)."
Robinson v. State, 865 So.2d 457, 468-69 (Ala.Crim.App.2003). Given the totality of the circumstances, we do not find the trial court's determination that the June 12 statement was voluntary to be manifestly against the great weight of the evidence.
Therefore, we find no error on the part of the trial court in denying Minor's motion to suppress his June 12 statement.

II.
Minor contends that the trial court erred in not allowing him to present evidence of a statement Derrick Jackson made to police. (Issue V in Minor's brief.)
The evidence at trial indicated that for at least a portion of the time Minor was alone with Ebious on the night of April 15, 1995, he was talking on the telephone with Derrick Jackson who, at that time, was in prison. After Ebious's death, Inv. Bush interviewed Jackson regarding his telephone conversation with Minor. Jackson apparently told Inv. Bush that Minor sounded fine on the telephone; that Minor did not sound mad; and that Minor told him he was "just laying back." (R. 1631.) On cross-examination, Minor's counsel elicited *395 testimony from Inv. Bush that he had taken a statement from Jackson. When asked if he knew that Jackson had died, Inv. Bush said he had no idea. Minor's counsel then attempted to question Inv. Bush about the content of the statement Jackson had made. The prosecutor lodged a hearsay objection.
During a conference outside the presence of the jury, Minor's counsel made inconsistent arguments regarding the admissibility of the statement. Counsel initially argued that they were not offering the statement for the truth of the matter asserted in the statement, but just for the fact that the statement was made. However, counsel later admitted that they were offering the statement to show Minor's state of mind at the time he was home alone with Ebious, which, counsel asserted, was "critical" to their defense. (R. 1635.) Counsel argued that the statement would be admissible under one or more of the hearsay exceptions in Rule 804, Ala.R.Evid., because Jackson was deceased and thus unavailable. However, when the trial court pointed out that counsel had not presented any evidence indicating that Jackson was, in fact, deceased, and that none of the exceptions listed in Rule 804 applied to Jackson's statement, counsel conceded that the statement did not fit into any exception to the hearsay rule, and then returned to their original argument that the statement was not hearsay because it was not being offered for the truth of the matter asserted. In response, the prosecutor pointed out that "[w]hat they are saying is critical would be the truth of the matters asserted by Derrick Jackson and that makes them definitional hearsay." (R. 1635.) The trial court then sustained the prosecutor's hearsay objection.
On appeal, Minor asserts the same inconsistent arguments presented to the trial court. He argues that the statement was not offered for the truth of the matter asserted in the statement, i.e., to prove that Minor was not mad and that he sounded fine on the telephone, but then argues that the statement should have been admitted to show his "state of mind," i.e., that he was not mad and that he was fine when he was talking to Jackson on the telephone.
Rule 801(c), Ala.R.Evid., defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "`A statement made out of court is not hearsay if it is given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial.'" Wilson v. State, 571 So.2d 1237, 1241 (Ala.Crim.App.1989), rev'd on other grounds, 571 So.2d 1251 (Ala.1990), quoting Bryant v. Moss, 295 Ala. 339, 342, 329 So.2d 538, 541 (1976).
Despite Minor's claim to the contrary, it is clear from the record as well as from Minor's argument on appeal that the truth of the matter asserted in the statement, i.e., that Minor was fine and that he was not mad while he was alone with Ebious on the night of April 15, 1995, is exactly what Minor was offering the statement to prove.[8] Therefore, the statement was clearly hearsay and was inadmissible unless it fell within one of the exceptions to the hearsay rule.
*396 Minor conceded at trial, and he concedes in his brief on appeal, that Jackson's statement does not fall within any of the hearsay exceptions in Rule 804(b), Ala.R.Evid. We agree. First, as the trial court correctly recognized, Minor failed to present any evidence showing that Jackson was deceased or that he was otherwise unavailable and thus failed to satisfy the threshold requirement of Rule 804, Ala.R.Evid. Moreover, even assuming that Jackson was, in fact, deceased, Jackson's statement was not former testimony, see Rule 804(b)(1); it was not a statement made under belief of impending death, see Rule 804(b)(2); it was not a statement against interest, see Rule 804(b)(3); and it was not a statement of personal or family history, see Rule 804(b)(4). In addition, we note that Jackson's statement also does not fit within any of the hearsay exceptions in Rule 803, Ala.R.Evid., although Minor did not make such an argument either at trial or on appeal. As the State correctly points out in its brief to this Court, if the statement had been offered to show Jackson's state of mind, it might have fallen within the hearsay exception in Rule 803(3), Ala.R.Evid. ("[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition"); however, because the statement was not offered to show Jackson's state of mind but to show Minor's state of mind, it was inadmissible hearsay and was properly excluded by the trial court.

III.
Minor contends that the trial court erred in not allowing him to present evidence indicating that Lakeisha had previously abused her children when, he says, the State opened the door for such evidence through its cross-examination of one of his defense witnesses. (Issue VII in Minor's brief.)
The record reflects that at several different points during the trial, Minor's counsel sought permission to introduce evidence indicating that Lakeisha had a history of physically abusing her three children. The trial court refused to allow Minor to present any such evidence regarding the other two children, but it did not prohibit Minor from presenting evidence regarding any abuse of Ebious.
During its case, the defense called Cynthia Nevels, among other witnesses, to testify. Nevels lived in the apartment next door to Lakeisha. Nevels testified on direct examination that she saw Lakeisha outside playing with a Frisbee the afternoon after Ebious had died, and that Lakeisha did not appear sad. On cross-examination, the following then occurred:
"[Prosecutor]: ... Did you see Lakeisha Jennings on the day her child died?
"[Nevels]: Yes.
"[Prosecutor]: Okay. Were you at her apartment?
"[Nevels]: No.
"[Prosecutor]: When you saw her, did you ever see her mistreat her child in any way?
"[Nevels]: No.
"[Prosecutor]: Did you ever enter her apartment on that date?
"[Nevels]: No.
"[Prosecutor]: Ms. Nevels, you don't know anything about the facts of what happened to Ebious Jennings on April 15th, do you?
"[Nevels]: No."
(R. 1975.) On redirect examination, the following occurred:
"[Minor's counsel]: Ms. Nevels, did you ever hear her mistreat her child?
"[Prosecutor]: I am sorry? Would you please repeat your question?

*397 "[Minor's counsel]: Did you ever hear her mistreat her child?
"[Prosecutor]: I am going to object.
"THE COURT: Well, I will sustain to that.
"[Minor's counsel]: Okay. No further questions."
(R. 1975-76.)
It is well settled that "[w]hen one party opens the door to otherwise inadmissible evidence, the doctrine of `curative admissibility' provides the opposing party with `the right to rebut such evidence with other illegal evidence.'" Ex parte D.L.H., 806 So.2d 1190, 1193 (Ala.2001), quoting Charles W. Gamble, McElroy's Alabama Evidence § 14.01 (5th ed.1996). "`"A party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject."'" Id., quoting Hubbard v. State, 471 So.2d 497, 499 (Ala.Crim.App.1984), quoting in turn Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App.1980). However, it is clear from the record that the prosecutor's cross-examination of Nevels was focused solely on Ebious and not the other two children as is evidenced by the prosecutor's references to "her child." Thus, the prosecutor's cross-examination did not "open the door" to any evidence of alleged abuse of Lakeisha's other two children. See, e.g., Allison v. City of Birmingham, 580 So.2d 1377, 1387 (Ala.Crim.App.1991) (prosecution's introduction of edited videotape did not violate trial court's pretrial ruling on the motion in limine and thus did not open the door for other portions of videotape to be admitted where those portions included matters that had been ruled inadmissible before trial).
Moreover, to the extent that Minor is arguing that he should have been allowed to present evidence indicating that Lakeisha had previously abused Ebious, we note that the trial court never prohibited Minor from presenting that evidence. All of the trial court's rulings throughout the trial in this respect were clear  Minor could not present evidence of any abuse of the other children, but the trial court never limited Minor with respect to evidence of any abuse of Ebious. The trial court's sustaining of the prosecutor's objection to the question "Did you ever hear her mistreat her child?" in no way altered its previous rulings. Although the prosecutor stated no grounds for the objection to this question and the trial court stated no reason for its sustaining the objection, Minor asserts in his brief that the objection was sustained on the ground of improper form. However, Minor never attempted to rephrase the question in proper form or otherwise to pursue the line of questioning regarding Lakeisha's alleged previous abuse of Ebious even though, based on the trial court's rulings throughout the trial, he could have.
Therefore, we find no error as to this claim.

IV.
Minor contends that the trial court erred in allowing the State to call Dr. William Hardin to testify in rebuttal. (Issue II in Minor's brief.) He also contends that the trial court erred in denying his motion for a new trial without allowing him to present what he claims was newly discovered evidence at the hearing on the motion for a new trial. (Issue I in Minor's brief.) Because these issues are related, we address them together.
As noted previously, the key issue in the case was who inflicted Ebious's injuries, and the main inquiry as to that issue was when Ebious suffered his injuries. Both parties presented medical testimony to *398 support their respective positions  the State presented testimony to the effect that Ebious's injuries had been inflicted within approximately one hour of Ebious's arrival at the hospital, i.e., when Minor was alone with Ebious, and the defense presented testimony to the effect that Ebious's injuries had been inflicted six to eight hours before Ebious's arrival at the hospital, i.e., when Lakeisha was alone with Ebious. The trial was, in large part, a battle of experts.
During its case-in-chief, the State introduced into evidence Ebious's hospital records from DCH. Those records indicated, among other things, that, when he arrived at the hospital, Ebious's hematocrit level, i.e., the percentage of red blood cells in his blood, was 11.4% (the normal range for an infant his age is between 42% and 52%). The State also presented testimony during its case-in-chief, from Dr. Downs, that the hematocrit level of 11.4% was consistent with Ebious losing close to 3/4 of his blood volume and going into shock. The State presented no testimony during its case-in-chief regarding the significance of Ebious's hematocrit level with respect to the timing of Ebious's injuries. However, during its case, the defense called two medical experts, Dr. Wetli and Dr. Nagi, both of whom testified that, in their opinions, it would take several hours for Ebious's hematocrit level to drop to 11.4%. To rebut this testimony, the State called Dr. William Hardin, a pediatric trauma surgeon and a professor at UAB. It appears from Dr. Hardin's testimony that he did not review any of Ebious's hospital records or the autopsy report. Rather, Dr. Hardin's testimony consisted of general testimony regarding hematocrit levels and responses to hypothetical questions posed by the prosecutor.
Dr. Hardin testified that the severity of the injuries and the rapidity of the blood loss are two factors that determine how fast the hematocrit level can drop. In addition, in response to the hypothetical questions posed by the prosecutor, Dr. Hardin testified that "in extreme circumstances" a two-month-old infant's hematocrit level could drop to 11.4% within an hour of the infliction of trauma. (R. 2032.) When the prosecutor described Ebious's injuries and asked if Ebious's hematocrit level of 11.4% upon arrival at the hospital was consistent with the infliction of injuries 30 minutes to an hour earlier, Dr. Hardin testified that Ebious's hematocrit level was not inconsistent with the injuries having been inflicted within an hour of his arrival at the hospital because, based on the prosecutor's description, Ebious had suffered "massive trauma." (R. 2035.) Dr. Hardin testified that he had even seen one child who had been brought to the emergency room within 30 minutes of trauma who had a hematocrit level of 5%. On cross-examination, Dr. Hardin reiterated that a hematocrit level of 11.4% within an hour of trauma, although unusual, is not inconceivable and stated that given the severity of Ebious's injuries, he was "not surprised" that Ebious's hematocrit level dropped that quickly. (R. 2037.)
We also note that the State recalled Dr. Downs in rebuttal as well. Although Dr. Downs was not called to rebut any testimony regarding Ebious's hematocrit level and the State did not question him in that regard, on cross-examination by defense counsel, Dr. Downs stated it is "very common" that children's hematocrit levels can fall "very, very low ... very quickly." (R. 2023-24.) Dr. Downs stated that he was aware of a case in which a child's hematocrit level had dropped to 4% within 30 minutes of the trauma.

A.
Minor contends that the trial court erred in allowing the State to call *399 Dr. Hardin to testify in rebuttal because, he says, Dr. Hardin's testimony was not a proper subject for rebuttal. Minor did not object to Dr. Hardin's testimony at trial, but instead raised this issue for the first time in his motion for a new trial; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
Minor argues that Dr. Hardin's testimony was not a proper subject for rebuttal because, he says, "the testimony did not cover any omissions or reply to or contradict any evidence introduced by the defendant, which had not already been discussed by the State's previous expert witnesses." (Minor's brief at p. 21.)
"The admission of rebuttal evidence is within the discretion of the trial judge. Crow v. State, 365 So.2d 1254 (Ala.Cr.App.1978), cert. denied, 365 So.2d 1256 (Ala.1979). `The State may, in the discretion of the trial court, introduce in rebuttal any competent evidence which explains or is a direct reply to or a contradiction of material evidence by the defendant.' Sprinkle v. State, 368 So.2d 554 (Ala.Cr.App.1978), writ quashed, 368 So.2d 565 (Ala.1979) (emphasis added [in Norris])."
Norris v. State, 429 So.2d 649, 650 (Ala.Crim.App.1982). See also Bishop v. State, 656 So.2d 394, 397-98 (Ala.Crim.App.1994), and Strong v. State, 538 So.2d 815, 817 (Ala.Crim.App.1988). Further, "[i]t is within the discretion of the trial court to receive, in rebuttal, testimony which more properly should have been offered as part of the case in chief." Ford v. State, 383 So.2d 601, 604 (Ala.Crim.App.1980). Section 15-14-4, Ala.Code 1975, provides:
"The court may, at its discretion, at any time before the conclusion of the argument, when it appears to be necessary to the due administration of justice, allow a party to supply an omission in the testimony on such terms and under such limitations as the court may prescribe."
"This court has previously held that the trial court has great discretion in allowing the prosecution or the defense to present additional testimony, whether that evidence was omitted in the case-in-chief or on rebuttal, at any time before the case is submitted to the jury." Little v. State, 676 So.2d 959, 963 (Ala.Crim.App.1996). See also Barger v. State, 562 So.2d 650, 653 (Ala.Crim.App.1989) ("A trial court has broad discretion to reopen evidence at any time prior to the close of final argument.").
As noted above, the State presented no evidence or testimony during its case-in-chief regarding the significance of Ebious's hematocrit level with respect to the timing of Ebious's injuries. However, during its case, the defense questioned both of its experts regarding the significance of Ebious's hematocrit level. The State then called Dr. Hardin to rebut the testimony of the defense experts regarding Ebious's hematocrit level. Contrary to Minor's contention, Dr. Hardin's testimony not only supplied an omission in the testimony elicited during the State's case-in-chief, but it also directly contradicted the testimony of the defense's two expert witnesses and was thus proper rebuttal.
Minor also argues that Dr. Hardin's testimony was not proper rebuttal because, he says, it was not competent evidence. According to Minor, "Dr. Hardin's testimony could not be considered competent evidence because it did not meet the requirements for expert scientific testimony set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)." (Minor's brief at p. 21.) Minor maintains that "Dr. Hardin's theory of rapidly dropping hematocrit" has never been subject to peer review or publication and is not generally accepted in the scientific community and *400 thus was not admissible scientific evidence. (Minor's brief at p. 14.)
Initially, we point out that Minor's reliance on Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is misplaced because the Daubert standard for admissibility of scientific evidence applies by statute in Alabama only to DNA evidence. See § 36-18-30, Ala.Code 1975; Bagley v. Mazda Motor Corp., 864 So.2d 301, 310 (Ala.2003); Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 516 n. 5 (Ala.2000); and Turner v. State, 746 So.2d 355 (Ala.1998). In Alabama, the standard for determining the admissibility of scientific evidence other than DNA evidence is that set forth in Frye v. United States, 293 F. 1013 (D.C.Cir.1923). See Turner, 746 So.2d at 361 n. 7 ("With respect to expert scientific testimony on subjects other than DNA techniques governed by § 36-18-30, Frye remains the standard of admissibility in Alabama.").[9]
That being said, the crux of Minor's argument is that Dr. Hardin's testimony did not satisfy the requirements for the admissibility of scientific evidence. However, as the State correctly points out in its brief to this Court, it was not necessary that Dr. Hardin's testimony satisfy those requirements because his testimony did not constitute novel scientific evidence. In this respect, we point out that Minor does not challenge the evidence of Ebious's hematocrit level or the testing procedure used by the laboratory personnel at DCH to obtain Ebious's hematocrit level. Rather, Minor's sole argument is that Dr. Hardin's testimony that, based on his training and experience, it was his opinion that Ebious's hematocrit level could have dropped to 11.4% within an hour of his receiving his injuries, was inadmissible. The Frye test, however, applies only to the admissibility of novel scientific evidence based on scientific tests or experiments. Dr. Hardin's testimony was no more novel scientific evidence than was the testimony of the defense's two experts on the same subject. Although Dr. Hardin's testimony was based on scientific evidence, i.e., the results of a blood test, it was not itself scientific evidence. Despite Minor's characterization of Dr. Hardin's testimony as a "theory of rapidly dropping hematocrit," Dr. Hardin's testimony was not a scientific theory, but was merely his opinion based on his experience and training as a pediatric trauma surgeon and, therefore, his testimony was not subject to the requirements of Frye. See, e.g., Courtaulds Fibers, Inc. v. Long, 779 So.2d 198 (Ala.2000) (holding that veterinarian's opinion as to cause of death of horses was not scientific evidence subject to admissibility requirements of Frye); Ex parte Dolvin, 391 So.2d 677 (Ala.1980) (holding that Frye test was inapplicable to testimony of forensic odontologist comparing skeletal remains with inter vivos photographs because testimony was in the nature of physical comparisons as opposed to scientific tests or experiments); Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999) (holding that Frye test was inapplicable to expert testimony in crime-scene analysis and victimology because testimony was not based on scientific principles but was in the realm of specialized knowledge); West v. State, 793 So.2d 870 (Ala.Crim.App.2000) (holding that Frye test was inapplicable to testimony of handwriting expert because testimony was not based on scientific tests or experiments); and Stewart v. State, 601 So.2d 491, 499 *401 (Ala.Crim.App.), on return to remand, 659 So.2d 120 (Ala.Crim.App.1992), aff'd in pertinent part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993) (holding that Frye test was inapplicable to testimony regarding results of lumi-lite test because the test did not involve "comparing scientific data or experiments such as deoxyribonucleic acid (DNA) testing or voice print analysis").
Instead, the admissibility of Dr. Hardin's testimony was governed by Rule 702, Ala.R.Evid., which provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Dr. Hardin's opinion that in extreme circumstances an infant's hematocrit level could drop to 11.4% within an hour of receiving trauma and his opinion, based on the prosecutor's hypothetical question, that Ebious's hematocrit level could have so dropped based on the severity of his injuries was proper under Rule 702. Although Minor did not challenge Dr. Hardin's qualifications at trial or on appeal, we note that Dr. Hardin was clearly qualified as a medical expert; he testified that he was board-certified in general and pediatric surgery, that he was an associate professor of surgery in pediatrics at UAB, and that he had been director of the trauma service at Children's Hospital for 10 years. His opinion was based on his training and experience as a pediatric trauma surgeon and was helpful to the jury in understanding the significance of Ebious's hematocrit level, an issue injected into the trial by Minor himself.
Therefore, we find no error, plain or otherwise, in the trial court's allowing Dr. Hardin to testify in rebuttal.

B.
Minor also contends that the trial court erred in denying his motion for a new trial without allowing him to present at the hearing on the motion for a new trial what he claims was newly discovered evidence. Specifically, Minor argues that the trial court should have allowed him to present the testimony of an expert who he describes as "an emergency room director with extensive experience in pediatric surgery." (Minor's brief at p. 14.) Minor alleges that this expert was prepared to testify that "Dr. Hardin's theory of rapidly dropping hematocrit did not meet the Daubert criteria" and that Dr. Hardin's testimony at trial that an infant's hematocrit level could drop to 11.4% within an hour of trauma was incorrect and "was not an opinion generally accepted within the medical community." (Minor's brief at pp. 14-15.) According to Minor, this expert's testimony constituted "newly discovered evidence" because "Dr. Hardin's testimony was a `surprise' as defined by law" and because "there was no way the defense could have anticipated Dr. Hardin's testimony since it was not medically accepted in the community." (Minor's brief at pp. 15-16.) Thus, Minor concludes, he should have been allowed to present this testimony at the hearing on his motion for a new trial and the trial court should have granted the motion on the ground of newly discovered evidence.
The record reflects that Minor was sentenced on March 27, 2001. Minor filed a motion for a new trial on April 16, 2001, and on April 25, 2001, Minor filed a supplemental motion for a new trial. In his original motion, Minor raised the claim that the trial court had erred in allowing *402 Dr. Hardin to testify regarding what he claimed were "theories, which were not acceptable in the medical community." (C. Supp.7.) Minor did not raise a claim of newly discovered evidence in either his original motion or his supplemental motion. On June 5, 2001, the trial court held a hearing on Minor's motions, and on June 11, 2001, the trial court issued a written order denying Minor's motions for a new trial. However, pursuant to Rule 24.4, Ala.R.Crim.P., Minor's motions were denied by operation of law on May 29, 2001.[10] The hearing on the motions was not continued past the sixtieth day set forth in Rule 24.4 by express agreement of the parties.[11] Thus, the trial court lacked jurisdiction to conduct the June 5 hearing and to issue its order denying Minor's motions, and this Court can consider neither the court's order nor anything that occurred at the hearing. See Edgar v. State, 646 So.2d 681 (Ala.Crim.App.1993), aff'd in pertinent part, rev'd in part, 646 So.2d 683 (Ala.1994). See also Finney v. State, 860 So.2d 367 (Ala.Crim.App.2002), and Rogers v. State, 819 So.2d 643 (Ala.Crim.App.2001). Because the trial court lacked jurisdiction to hold the hearing on Minor's motion for a new trial, Minor's argument that he should have been allowed to present certain testimony at that hearing is moot.
Moreover, we find the denial of Minor's motions for a new trial by operation of law to be proper. As noted in Part IV.A. of this opinion, Dr. Hardin's testimony was opinion testimony, not scientific evidence, and thus did not have to meet the admissibility requirements for scientific evidence. Consequently, any testimony from Minor's expert that Dr. Hardin's opinion did not satisfy the requirements for admissibility of novel scientific evidence would be irrelevant to the issue whether Dr. Hardin's testimony was admissible.
In addition, the testimony Minor wanted to present does not constitute newly discovered evidence.
"[I]n order to establish the necessity for a new trial based on newly discovered evidence, the appellant must prove: (1) that the evidence was discovered after the trial; (2) that the evidence could not have been discovered prior to trial by due diligence on the part of the movant; (3) that the evidence is material to the issue of the appellant's guilt; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would probably change the outcome if a new trial was granted."
Gillespie v. State, 644 So.2d 1284, 1289 (Ala.Crim.App.1994). Even assuming, for the sake of argument, that Minor could not have anticipated Dr. Hardin's testimony as he alleges and that, therefore, the evidence could not have been discovered before trial with due diligence, the proposed testimony of Minor's expert serves only to impeach the credibility of Dr. Hardin. "`"Evidence tending merely to impeach or contradict a State witness as to the testimony *403 given upon the trial is generally not such newly discovered evidence as would warrant the granting of a new trial."'" Clark v. State, 621 So.2d 309, 327 (Ala.Crim.App.1992), quoting Midell v. State, 570 So.2d 820, 822 (Ala.Crim.App.1990), quoting in turn Dossey v. State, 489 So.2d 662, 666 (Ala.Crim.App.1986). Moreover, we do not believe this testimony would have changed the outcome of the trial. Contrary to Minor's contention, Dr. Hardin's testimony was by no means "the only evidence connecting [him] to the murder." (Minor's brief at p. 17.) As the State correctly points out in its brief to this Court, the State presented an abundance of evidence, both medical and nonmedical, establishing that Ebious's injuries were inflicted while Minor was alone with Ebious. In addition, other than Dr. Hardin, none of the medical evidence presented by the State was based on Ebious's hematocrit level; it was based on numerous other medical factors. Under these circumstances, we find it highly unlikely that the proposed testimony of Minor's expert would have changed the outcome of his trial.[12]
Therefore, we find no error in the denial of Minor's motions for a new trial.

V.
Minor contends that the trial court erred in not removing juror Y.G. from the jury or, in the alternative, in not declaring a mistrial after juror Y.G. reported that she had been harassed by Minor's brother. (Issues III and IV in Minor's brief). Specifically, Minor argues that he was denied a fair trial because, he says, based on juror Y.G.'s comments to the trial court, "she felt harassed, and it is reasonable to assume she took this prejudice with her back to the jury room." (Minor's brief at p. 26.) Minor also contends that the prosecutor made inappropriate comments in front of juror Y.G. when she reported the harassment in a "flagrant attempt ... to prejudice [juror Y.G.] even further." (Minor's brief at p. 29.)
The record reflects that the jury returned its guilt-phase verdict on the evening of Tuesday, February 6, 2001, after which the trial was recessed for the evening. The following morning, Wednesday, February 7, 2001, just before the penalty phase of the trial began, juror Y.G. reported to the court that she had been harassed by Minor's brother during the guilt-phase of the trial and requested the trial court's assistance in stopping the harassment. A lengthy colloquy then occurred. For a full understanding of Minor's arguments regarding juror Y.G., we find it necessary to quote the entire colloquy that occurred on the morning of February 7, 2001:
"THE COURT: Let the record reflect that we are in the courtroom with Juror [Y.G.].
"You had something that you wanted to say?
"JUROR [Y.G.]: I do. I am really sick and tired of these harassments that I am experiencing from some of these *404 people who are out in this corridor, particularly the man with the beard.
"I reported the other day that he stood at the doorway and he kept shaking his head towards the jurors as the  the case was going on. And then when I  when we left out of the courtroom, he made a statement directly towards me saying that I had no business being up here. And  And then a few minutes ago when I stepped off the elevator  Oh, and then yesterday afternoon when I got ready to go downstairs to get something to drink, I mean, just [as] loudly as he could, he was saying stuff like well, she's the one that's going to have to live with what she does.
"You know, I consider that harassment.
"THE COURT: Sure.
"JUROR [Y.G.]: I don't appreciate it.
"He also made a statement during the trial and  and this is his  his language, not mine. He said he doesn't have any business up there. That damn girl is the one who needs to be up there. And he said it as soon as I walked out of the  out of the courtroom and I reported it to the bailiff, this happened.
"But then this morning when I came off the elevator and I was looking around, because sometimes I get confused which direction I should go, I headed towards that direction and he says she knows she had better not come down this way.
"You know, I came here to do something.
"(Juror [Y.G.] upset.)
"JUROR [Y.G.]: And this case has weighed very heavily on me.
"THE COURT: Well, I understand, [Y.G.].
"JUROR [Y.G.]: And I was very fair and I listened to all sides and I did  I did what my conscience and what the evidence I felt caused me to say that this young man was guilty.
"I take no delight and no pleasure in any of this. I happen to think somebody would be sadistic who would. But yet I don't want to be harassed. I am a citizen here and I have not done anything wrong.
"THE COURT: I understand that.
"JUROR [Y.G.]: And I don't appreciate feeling even scared to be in this courtroom.
"THE COURT: Right.
"JUROR [Y.G.]: And to be in this courthouse and to worry about going to my car because people are surrounding me saying these crazy things. And I haven't done anything, Your Honor.
"THE COURT: All right.
"JUROR [Y.G.]: And you know yourself when you were all going through the process of trying to come up with somebody with  with people, I thought that I had even known this young man, I was the first person  You all didn't even ask me. I volunteered that information because I wanted to be truthful.
"THE COURT: Right.
"JUROR [Y.G.]: And to be fair. But I don't need this.
"THE COURT: I understand.
"JUROR [Y.G.]: I don't.
"[Minor]: [Y.G.] 
"MS. BOCKMAN [defense cocounsel]: No.
"[Defendant Minor]: If it will give you any comfort, I will assure you that my family will not be harassing you or making any more comments toward you. I will personally 
"MS. DURHAM [assistant prosecutor]: Judge, I ask that the individual be *405 identified and removed from the courtroom.
"THE COURT: Is he going to be one of your witnesses?
"MR. TURBERVILLE [lead defense counsel]: Judge, he was, but I won't include him.
"MR. SULLIVAN [lead prosecutor]: I would like this man 
"THE COURT: Can we get him out of the courthouse and tell him if we see him around here, he is going to jail[?]
"[Defendant Minor]: [Judge] Wilson 
"MR. SULLIVAN: I would like the man identified.
"[Y.G.], I know this is difficult for you.
"JUROR [Y.G.]: This has been a hard case, awful.
"MR. SULLIVAN: But if there is any way for you to identify this man, I want a police report filed and I am going to initiate criminal proceedings for tampering with a jury.
"[Defendant Minor]: Man, this is hearsay.
"MR. TURBERVILLE: Willie, Willie, don't worry. Be quiet. Be quiet.
"[Defendant Minor]: And I don't want any more 
"MR. TURBERVILLE: Willie, he can't do it. There is no criminal offense.
"MR. SULLIVAN: Yes, there is.
"[Defendant Minor]: If they did the right thing in this case, I wouldn't be in this courtroom today.
"THE COURT: Willie.
"[Y.G.], if you don't mind, let's let you go back to this jury room till we can get this taken care of.
"(Pause. Whereupon, Juror [Y.G.] exited the courtroom.)
"MR. SULLIVAN: Dan [Turberville], if you know who he is, I would appreciate it if you would identify him for the record. I do intend to have the matter investigated. If it merits it, I do intend to have him prosecuted for tampering with a jury. Obviously, I do believe that this is his intent in this case and it will not be tolerated.
"MR. TURBERVILLE: Well, Judge, first off, I would ask for a mistrial because it's obvious that this woman felt some intimidation. She certainly associated this  this person with the defendant and as much as she says that she was, quote, fair, Judge, I don't think she could put that out of her mind, these type things, and obviously she couldn't because she said it had been on her mind. And her self-serving statement that she had judged by the evidence and the testimony and that, Judge, I  she may believe that, Judge, but the point is I think that by her demonstration this morning, her judgment had to be somewhat tainted because 
"THE COURT: Well 
"MR. TURBERVILLE:  because she did  she did feel intimidation, she did feel fear, although I don't know of any threats towards her that she indicated.
"THE COURT: We can bring her back in and let you question her.
"MR. TURBERVILLE: I would like to.
"THE COURT: All right. Let's bring [Y.G.] back in.
"(Pause. Juror [Y.G.] present.)
"THE COURT: [Y.G.], if you would, come up here. They wanted to ask you just a couple of questions if you don't mind.
"JUROR [Y.G.]: Okay. When I 
"EXAMINATION
"BY MR. TURBERVILLE:
"Q. [Y.G.], I don't want to make a bad situation any worse, but I do have a *406 duty to ask you some questions if we could?
"A. That's fine.
"Q. If you would, just  Well, I guess you have already given your name but, for the record  but if I could get it again?
"A. [Y.G.].
"Q. [Y.G.], when you were speaking [a] while ago about the stress that has been added to an otherwise very stressful situation, I think you said that it started last week when he was  had his face in the window and looking toward y'all or something; is that right?
"A. And shaking his head.
"Q. All right.
"A. Yes.
"Q. And then can you remember  And, again, you don't have to be exactly right  about when was your next encounter with him?
"A. The very next encounter was when I walked out the door that same day.
"Q. That same day, okay. And what happened then?
"A. This same man with the beard and the black hat 
"Q. Sure.
"A.  said to me  said in my presence, and I was the  all of the other jurors had kind of moved ahead.
"Q. Sure.
"A. And I am always, I guess, the last one, lagging behind, because I am trying to get my little water and stuff.
"Q. Sure.
"A. But he said to me  I mean, he said in my presence he  they have the wrong person in there, anyway. That damn girl ought to be the one that they ought to be looking at.
"Q. All right. So that wasn't a threat towards you, of course.
"A. No, it wasn't.
"Q. Okay.
"A. But I thought it was an inappropriate statement.
"Q. Certainly was. No question about that. No question about that.
"All right. And did you associate him with being  Well, obviously you associated him with being some relation with the defendant?
"A. I  No. I  No. Well, the only association that I thought he might have had with the defendant was that he was either a friend or just knew him or 
"Q. That is what I mean. Somebody on his side, I guess we'd say.
"A. Oh, obviously so.
"Q. Well, sure.
"A. If he were to stand in the door and shake his head 
"Q. Sure.
"A.  at everything that was being said.
"Q. Sure. Sure. After that encounter the next day, what can you recall happening next?
"A. The next encounter?
"Q. Uh-huh (yes).
"A. Well, yesterday afternoon when I was about to go down and get some  a [soft drink], he said  he just kept going on and on and on standing there as I was waiting for the elevator: Well, she's going to have to be the one to live with what she does. They are  And then he said they, they are going to live with what they did. Oh, yeah. They are going to have to be the ones that have to deal with whatever decision they come up with. So I assumed he was thinking at that time *407 that we had some preconceived verdict, which we did not.
"Q. And did that upset you?
"A. Well, I thought, again, it was an inappropriate statement made in the presence of a juror. And with the loud tone of voice that he said it and the way he said it, it was clearly meant, I think, to harass me.
"Q. Okay. All right. And then did  And y'all  Had y'all started deliberations then? Do you recall?
"A. No, we had not.
"Q. Okay. And then did you have any other encounters with him?
"A. This morning.
"Q. This morning, okay.
"A. By the way, I reported that to the bailiff 
"Q. I understand.
"A.  when he was standing there at the door 
"Q. Sure.
"A.  shaking the head and the comments that he made.
"Q. But he never came back to the door, did he?
"A. No, he did not, because the bailiff assured me that he would take care of it.
"Q. Right. Right. And this morning, what was it that he said?
"A. When I got off the elevator, I turned, headed in the wrong direction and I was headed in the direction where they were all seated.
"Q. Yes, ma'am.
"A. And he said she had better not come down this way. She had better go back down the other way.
"Q. Sure. Sure. Okay. Now, ma'am are you telling us that  that none of that entered into your mind while you were sitting in judgment in this case and while y'all were deliberating?
"A. What do you mean?
"Q. The fact that you had been harassed by someone friendly to the 
"A. Absolutely not.
"Q. Okay.
"A. I am a better person than that.
"Q. Well, I am sure you are, but I have to ask you these questions.
"A. I understand. But please allow me to answer my questions.
"Q. Oh, absolutely. Sure.
"A. Let me just say this, Mr. Turberville: I am a person grounded in my values and I am not the kind of person who would take another  one person's actions and  in any way, in any way cause there to be  that to be a factor in me deciding the  what will happen to another person.
"This was a young man's life. This was a young man's life. Yes, a baby's life was taken, but this is a young man's life as well. If I thought for a split second  And God is my witness to this  that that would have interfered in any way, in any way, or would have caused me to sway against this young man, I would have been right in this courtroom saying I ask that you remove me from the case.
"Q. I understand. I appreciate that.
"A. I am a person of principles.
"Q. Yes, ma'am. I know you are. I know you are. [Y.G.], did you discuss this with any of the other jurors at all?
"A. About  About him?
"Q. About the harassment, not about  Yeah, the guy out in the hall I am talking about. Not Willie Minor.

*408 "A. No  Well, the other jurors, the other jurors noticed that he was  that he was standing at the doorway.
"Q. Sure.
"A. And some  And somebody said something about: Who is that that keeps standing at the doorway?
"Q. Okay.
"A. But that was the extent of it.
"Q. All right. And, again, he didn't come back to the doorway after y'all made that known?
"A. No. No. No.
"Q. Did you discuss with the jurors any about the harassment in the hall yesterday and the time before?
"A. No.
"Q. Okay. Never brought that up with them?
"A. I haven't even been in the room with the jurors this morning.
"Q. No. I mean last week or  or whenever  You know, like you said, you went out in the hall the next day or something and he made a comment and then he made the  another comment another time.
"A. Well, when someone said who is that standing at the door, I said he said something to me but I reported it to the bailiff and the bailiff is going to take care of it.
"Q. Okay. And that was all you recall?
"A. Right.
"Q. Okay. Good, [Y.G.]. And let me ask you: Do you think this affected your decision in any way?
"A. Absolutely, positively not, beyond a shadow of no doubt.
"Q. Okay. Thank you so much.
"A. No.
"Q. Thank you very much. I appreciate it and I am sorry I had to ask you that.
"A. That's okay. I understand. I understand. I understand.
"THE COURT: Let me ask you this, [Y.G.].
"JUROR [Y.G.]: Yes.
"THE COURT: We are about to proceed into the sentencing hearing. Do you think these events would in any way influence your decision in the sentencing?
"JUROR [Y.G.]: No. I  I see that man out there as whoever he is. I see this young man over here for Willie Minor. One has nothing to do with the other except that I am in a public facility and I don't want to be harassed.
"THE COURT: I understand that.
"JUROR [Y.G.]: The issue is not [sic] Willie. The issue is not one of his relatives or anything like that.
"So far as this goes, there was testimony that showed that Lakeisha's character was questionable. That didn't have anything to do with  with the verdict. I mean, that doesn't have anything to do with it.
"The facts of the case 
"THE COURT: Okay.
"JUROR [Y.G.]:  are  are all that I am concerned about. And as I said previously, I am simply here to do a civic duty but I would like to do the civic duty without being harassed.
"THE COURT: Oh, I understand.
"JUROR [Y.G.]: And it's just that simple.
"THE COURT: And you have that right.
"JUROR [Y.G.]: There is no more to it.
"MR. TURBERVILLE: All right.
"THE COURT: Anything else, Mr. Turberville?

*409 "MR. TURBERVILLE: No, Your Honor.
"THE COURT: Mr. Sullivan?
"MR. SULLIVAN: No, sir, Judge.
"THE COURT: [Y.G.], thank you very much for letting us know about this.
"JUROR [Y.G.]: No problem. And is that not what I was to have done?
"MR. SULLIVAN: Yes, ma'am.
"MR. TURBERVILLE: That is exactly right.
"JUROR [Y.G.]: Okay. Okay.
"THE COURT: I understand.
"MR. SULLIVAN: Again, I do hate to ask, but 
"JUROR [Y.G.]: Do you need me back?
"MR. SULLIVAN: But can you identify this person for the record?
"JUROR [Y.G.]: Yes, I can. He is a black male. He has a full beard. Everyday he's worn a black, flat hat on his head and  and he's  he's relatively thin but not extremely  but not skinny. And I  And he wears glasses.
"MR. SULLIVAN: Can we bring this individual into the courtroom, Judge?
"MR. TURBERVILLE: Judge, I know who the  the individual is. She identified him as the person at the door. I think that's just 
"MR. SULLIVAN: Well, I am talking about going further than that, Dan, and I am not going to go into it at this point, where I am going with this, but I need an identification by this juror.
"THE COURT: Is he out there?
"(Pause.)
"MR. SULLIVAN: [Y.G.], should an individual be brought into the courtroom, this may or may not be the individual you are referring to. And unless you are sure, please do not make an identification 
"JUROR [Y.G.]: I won't. I would never do that.
"MR. SULLIVAN:  unless you are positive.
"JUROR [Y.G.]: I would never do that.
"DEPUTY: He is not on the floor right now, Judge. I think that he is in the building somewhere.
"THE COURT: Where?
"DEPUTY: He went downstairs or something.
"MR. SULLIVAN: Check the lawyer's lounge.
"MR. TURBERVILLE: They are not in there.
"(Pause.)
"THE COURT: [Y.G.], if we are unable to find him and later he comes into the courtroom, could you get our attention and let us know?
"JUROR [Y.G.]: Yes, sir, I will.
"THE COURT: Okay.
"(Pause.)
"DEPUTY: Simpson said him and his wife went downstairs somewhere. They don't know where he went.
"THE COURT: [Y.G.], if you don't mind, let me get you to go back to that jury room just one more time.
"JUROR [Y.G.]: Okay.
"THE COURT: We will be bringing the jury in in just a minute.
"JUROR [Y.G.]: Okay.
"(Pause. Whereupon, Juror [Y.G.] exited the courtroom.)
"THE COURT: Did you have anything to add? Oh, they have him? Okay.
"(Pause. Whereupon, a person was brought into the courtroom. Pause. *410 Juror [Y.G.] entered the courtroom.)
"THE COURT: Is this the man, [Y.G.]?
"JUROR [Y.G.]: Yes.
"THE COURT: Okay.
"Sir, this juror has made some accusations against you and I am going to have to ask you to leave the courthouse and not come back till this trial is over with.
"I would further advise you there may be some criminal charges pending against you.
"You are not to say anything to a juror. And if I hear that you have said anything else to this woman, I will personally see that you go over to that jailhouse.
"Do you understand me?
"MR. PRINCE: Yes, sir, Your Honor. I haven't said anything to this lady. I don't know where she is getting that from.
"MR. SULLIVAN: We would ask this gentleman to identify himself for purposes of the record.
"THE COURT: Could you state your name?
"MR. PRINCE: Yes, sir. My name is Alfred Prince, Sr.[[13]] And I don't understand what this is all about, sir. I didn't do anything. I didn't say anything.
"MR. TURBERVILLE: Don't say anything right now. Now is not the time. Don't worry about it.
"MR. PRINCE: Well, yeah. I mean, what did you say? What am  What's up? I don't know what's up.
"MR. SULLIVAN: I will find out, Mr. Prince. Thank you.
"[Defendant Minor]: Judge Wilson, she stated in her statement, she said that she overheard the brother, better not come back down there. So, by being a juror, she took into the consideration that my brother was talking about her. Ms. Jennings's family also come down there saying  It's also other females out there. But I don't see any factual evidence to state that she was harassed. It is her word against his word in this particular case.
"THE COURT: We are not going to have 
"[Defendant Minor]: They have me on trial here. They have found me guilty of capital murder once again, not my family. Don't harass my family in this courtroom.
"THE COURT: Well, Mr. Minor 
"[Defendant Minor]: Convict me and sentence me.
"THE COURT: You need to sit down and be quiet right now. You're not helping yourself one bit.
"MR. PRINCE: Your Honor, Your Honor, sir, I haven't done anything and I don't understand why this lady is saying this about me. I have been standing out there in the hallway.
"MR. SULLIVAN: What did you say?
"THE COURT: That will be up to another Court to determine, Mr. Prince. But we have some allegations of misconduct 
"MR. SULLIVAN: What did you call me?
"THE COURT:  and you have been identified and 
"MR. PRINCE: I wouldn't come into your court and lie to you.
"THE COURT: That will be for another Judge and another court to decide. But we are going to have to ask you to *411 leave because we are not going to have any taint on this trial.
"MR. PRINCE: I understand that and I wouldn't bring it in here. I don't understand this.
"MR. SULLIVAN: I want full identifying information on him. I want his name, his date of birth. I want his Social Security number. I want his address.
"MR. TURBERVILLE: Mr. Prince, better go on out now.
"[Defendant Minor]: Go on out, brother. It will be all right.
"THE COURT: [Y.G.], you can go ahead in the jury box.
"[Defendant Minor]: You didn't hear me call you nothing.
"MR. TURBERVILLE: He's come over here yelling at him while Mr. Prince was talking and 
"THE COURT: We are fixing to bring the jury in. Let's just try to conduct this in a civil manner from this point.
"MR. TURBERVILLE: I would object to the prosecutor 
"MR. SMITH: Judge 
"MR. TURBERVILLE:  harassing the defendant at the 
"[Defendant Minor]: Any charges be brought up on that.
"MR. SULLIVAN: I object to the defendant calling me a m____f____.
"MS. BOCKMAN: Judge, I object to that being said in front of this juror.
"MS. DURHAM: The defendant is the one who said it in front of the juror.
"MS. BOCKMAN: No. If anything was said, it was said over here. I don't know what was said. I did not hear it. But to say that in front of a juror is 
"THE COURT: Let's bring the rest of the jury in, please.
"JUROR [Y.G.]: I just need to know 
"THE COURT: Do what?
"JUROR [Y.G.]: I need to know, Your Honor, so that I can do the right thing. Am I not to say anything about 
"THE COURT: Please don't.
"JUROR [Y.G.]: Okay.
"THE COURT: Please don't.
"JUROR [Y.G.]: Okay."
(R. 2253-77.) At that point, the rest of the jurors were brought into the courtroom and the penalty phase of the trial began.

A.
Minor first contends that the trial court erred in denying his motion for a mistrial or in not removing juror Y.G. from the jury based on her allegations of harassment by Minor's brother.[14] He argues that despite juror Y.G.'s assurances that the harassment did not affect her guilt-phase verdict and would not affect her penalty-phase verdict, "it is reasonable to assume" that she was prejudiced against him and took that prejudice with her into deliberations and that, therefore, he was denied a fair trial by a panel of impartial jurors. (Minor's brief at p. 26.)
Initially, we note:
"`A mistrial is a drastic remedy that should be used sparingly and only to *412 prevent manifest injustice.' Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim.App.1999), aff'd, 777 So.2d 777 (Ala.2000) (citing Ex parte Thomas, 625 So.2d 1156 (Ala.1993)). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v. State, 593 So.2d 130, 135 (Ala.Crim.App.1991). `"The granting of a mistrial is addressed to the broad discretion of the trial judge, and his ruling will not be revised on appeal unless it clearly appears that such discretion has been abused."' Grimsley v. State, 678 So.2d 1197, 1206 (Ala.Crim.App.1996) (quoting Free v. State, 495 So.2d 1147, 1157 (Ala.Crim.App.1986))."
Baird v. State, 849 So.2d 223, 247 (Ala.Crim.App.2002). "`[T]he granting of a mistrial in cases of private communications between jurors and third persons is largely within the discretion of the trial judge, and his decision is subject to reversal only where that discretion has been abused.'" Cox v. State, 394 So.2d 103, 105 (Ala.Crim.App.1981), quoting Woods v. State, 367 So.2d 974, 980 (Ala.Crim.App.), rev'd on other grounds, 367 So.2d 982 (Ala.1978). "In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion `where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark.'" Holland v. State, 588 So.2d 543, 546 (Ala.Crim.App.1991), quoting Bascom v. State, 344 So.2d 218, 222 (Ala.Crim.App.1977).
"`Any communication or contact outside the jury room about the matters at trial between a juror and another person is forbidden where that contact "might have unlawfully influenced that juror."'" Knox v. State, 571 So.2d 389, 390-91 (Ala.Crim.App.1990), quoting Ebens v. State, 518 So.2d 1264, 1267 (Ala.Crim.App.1986), quoting in turn Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932). However:
"An unauthorized contact between the jurors and a witness [or other person] does not necessarily require the granting of a mistrial. It is within the discretion of the trial court to determine whether an improper contact between a juror and a witness [or other person] was prejudicial to the accused."
Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984).
"The prejudicial effect of communications between jurors and others, especially in a criminal case, determines the reversible character of the error. Whether there has been a communication with the juror and whether it has caused prejudice are fact questions to be determined by the Court in the exercise of sound discretion."
Gaffney v. State, 342 So.2d 403, 404 (Ala.Crim.App.1976).
Minor cites Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), and Ex parte Pierce, 851 So.2d 606 (Ala.2000), for the proposition that whenever a juror has contact with outside influences, prejudice is presumed. However, as the State correctly points out in its brief to this Court, both Turner and Ex parte Pierce are distinguishable from the present case and are thus not controlling. In both Turner and Ex parte Pierce, the jurors had close and continual contact with key prosecution witnesses throughout the trial; specifically, the law-enforcement officers who were in charge of taking care of the jury, who transported the jurors to and from their lodging each day, who ate meals with the jurors, and who conversed with the jurors on a regular basis throughout the trial, were key prosecution witnesses in both Turner and Ex parte *413 Pierce. Based on this situation, the United States Supreme Court held in Turner, and the Alabama Supreme Court held in Ex parte Pierce, that the defendant's due-process right to a fair trial by an impartial jury was violated and that prejudice could be presumed from such close and continual contact even if there was no evidence to show that the law-enforcement officers had discussed the facts of the case with the jurors. Specifically, the Court in Turner stated that "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." 379 U.S. at 473, 85 S.Ct. 546.
In this case, there was no contact between the jury and prosecution witnesses, much less the close and continual contact that occurred in Turner and Ex parte Pierce. Rather, the outside contact juror Y.G. had in this case was with the defendant's brother, who made several comments within the hearing of, and presumably directed at, juror Y.G. Therefore, prejudice cannot be presumed under the facts in this case as it was in Turner and Ex parte Pierce; rather, as this Court held in Myers v. State, 677 So.2d 807, 810 (Ala.Crim.App.1995), "[i]n order to be entitled to a mistrial due to contact by a juror with witnesses or others, prejudice must be shown." See also Mangione v. State, 740 So.2d 444, 453-55 (Ala.Crim.App.1998); Johnson v. State, 648 So.2d 629, 634-37 (Ala.Crim.App.1994); and Davis v. State, 457 So.2d 992, 993-95 (Ala.Crim.App.1984).
In order to show prejudice in a case such as this one involving misconduct by a non-juror in speaking to a juror, a defendant must establish only that the verdict might have been affected by the juror's outside contact with the other person. See Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932) ("The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered."). See also Ex parte Dobyne, 805 So.2d 763, 771 (Ala.2001) (citing Roan in the context of juror misconduct, specifically the failure of a juror to properly respond to questions on voir dire). However, this might-have-influenced-the-verdict standard nevertheless requires more than a mere showing that the juror was exposed to outside influences. See Ex parte Apicella, 809 So.2d 865 (Ala.2001). In Ex parte Apicella, the Alabama Supreme Court, addressing a juror-misconduct claim (a juror spoke with an attorney not associated with the case), explained the standard as follows:
"On its face, this standard would require nothing more than that the defendant establish that juror misconduct occurred. As Apicella argues, the word `might' encompasses the entire realm of possibility and the court cannot rule out all possible scenarios in which the jury's verdict might have been affected.
"However, as other Alabama cases establish, more is required of the defendant. In Reed v. State, 547 So.2d 596, 598 (Ala.1989), this Court addressed a similar case of juror misconduct:
"`We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror's [misconduct]. Rather, it is a case's own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been reached. While the question of whether she might have been unlawfully *414 influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant's motion for a new trial that her vote had not been affected by the [misconduct].'
"It is clear, then, that the question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case. In this case, as in Reed, the effect of the misconduct was confined to the juror who committed the misconduct. The Reed Court stated:
"`We cannot agree with the defendant that the verdict rendered might have been unlawfully influenced, where the results of the [misconduct] were known only to the one juror who [committed the misconduct] and that juror remained unaffected by the [misconduct].'
"547 So.2d at 598. Because no evidence indicates that [the juror] shared the content of his conversation with the other members of the jury and because no evidence indicates that [the juror's] own vote was affected, we cannot say the trial court abused its discretion in finding no actual prejudice."
809 So.2d at 871.[15]
In this case, as in Ex parte Apicella, juror Y.G. did not discuss the comments she overheard with other members of the jury, and there is no evidence indicating that juror Y.G. was influenced by the comments. Although juror Y.G. stated that other members of the jury had seen Minor's brother standing by the door in the courtroom, and she informed them that he had made comments to her that she had reported to the bailiff, juror Y.G. denied discussing the comments with the other jurors in any further detail.[16] The trial court also specifically instructed juror Y.G. not to discuss with the other jurors what had occurred in the courtroom outside of their presence. In addition, in response to questioning by Minor's counsel, juror Y.G. adamantly denied that the comments from Minor's brother affected her guilt-phase verdict or would affect her penalty-phase verdict in any way. Juror Y.G. specifically stated that she had based her guilt-phase verdict on the evidence; that the harassment she felt from Minor's brother "absolutely [did] not" enter her mind while she was deliberating during the guilt phase; that she did not, and would not, consider Minor's brother's actions in deciding Minor's fate; that the harassment "[a]bsolutely, positively [did] not, beyond a shadow of no doubt" influence her verdict in any way; and that if she "thought for a split second" that Minor's brother's comments would have interfered with her objectivity in any way, she would have requested to be removed *415 from the jury. Juror Y.G. further stated, in response to questioning by the court, that the harassment by Minor's brother would not influence her penalty-phase verdict in any way; that she believed Minor's brother's actions "has nothing to do with" the penalty phase of the trial; and that "the facts of the case" were "all that [she is] concerned about."
Under these circumstances, we find no abuse of discretion on the part of the trial court in denying Minor's motion for a mistrial or, in the alternative, in not removing juror Y.G. from the jury.

B.
Minor also contends that the trial court should have declared a mistrial, or, in the alternative, removed juror Y.G. from the jury after the prosecutor made several comments in front of juror Y.G. during the colloquy which, he says, were "a flagrant attempt by the prosecution to prejudice this juror" against him. (Minor's brief at p. 29.) Specifically, Minor complains about the prosecutor's statements to, and in front of, juror Y.G. regarding her identification of the man who had harassed her so that the prosecutor could investigate and possibly bring criminal charges against the man. Minor also complains about the prosecutor's objection toward the end of the colloquy  "I object to the defendant calling me a m____f____." Minor did not object to the prosecutor's statements regarding juror Y.G.'s identifying the man who had been harassing her so that he could investigate and possibly bring criminal charges against the man, and, although Minor objected to the prosecutor's objection, he did not receive an adverse ruling on the objection, and he never moved for a mistrial on that ground. Therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
"The prosecutor's duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction." Smith v. State, [Ms. CR-97-1258, December 22, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000), aff'd in pertinent part, rev'd on other grounds, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003). "In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). "`Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.'" Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).
Initially, we point out that the prosecutor's comments about which Minor complains were not made in the presence of the entire jury, but only in the presence of juror Y.G. At the conclusion of the colloquy, pursuant to juror Y.G.'s question, the trial court specifically instructed juror Y.G. not to discuss what had occurred during the colloquy. Minor does not argue, and *416 the record does not reflect, that juror Y.G. discussed what had occurred with any of the other jurors, or that any of the other jurors became aware of what had occurred at any point in time. Absent any indication in the record to the contrary, we review this issue in light of the fact that only one juror heard the comments.
With respect to the prosecutor's request that juror Y.G. identify the man who harassed her and his reference to investigating and possibly prosecuting Minor's brother for his actions, we note that "[i]t is the obligation of the attorney general and the district attorney to expose and prosecute crimes." Dickerson v. State, 414 So.2d 998, 1008 (Ala.Crim.App.1982), overruled on other grounds, Ex parte Bohannon, 564 So.2d 854 (Ala.1988). "`A duty rests upon the prosecuting attorney to prosecute in his county or district, on behalf of the people, all public offenses.'" Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 910 (Ala.1992), quoting 63A Am.Jur.2d Prosecuting Attorneys § 24 (1984). The prosecutor, in attempting to identify the individual who had harassed juror Y.G., was merely doing his duty. We find no impropriety in the prosecutor's comments, and we refuse to hold, as Minor urges us to do, that the prosecutor's statements were a deliberate attempt to prejudice juror Y.G. against Minor.
Moreover, after thoroughly reviewing the record, we cannot say that the prosecutor's statements prejudiced Minor's substantial rights or so infected the trial with unfairness as to make Minor's resulting sentence a denial of due process (the comments were made after the jury had returned its guilt-phase verdict and thus did not affect the propriety of the conviction). A prosecutor's duty is common knowledge, and the record shows that juror Y.G. was already well aware that Minor's brother's comments to her were inappropriate before the prosecutor made his comments  juror Y.G. reported the harassment not only to the bailiff, but to the trial court as well, and she specifically stated, when questioned by Minor's counsel, that she felt the comments were inappropriate. We do not believe that the prosecutor's indication that he, too, felt the comments were inappropriate affected juror Y.G. in any way. When questioned about the harassment, juror Y.G. was adamant that she viewed Minor and his brother separately and that she would not hold his brother's actions against Minor. Although this questioning occurred before the prosecutor's statement regarding the possible prosecution of Minor's brother for jury tampering, given juror Y.G.'s strong language in her answers as well as her knowledge that the comments that Minor's brother was making were inappropriate, we cannot say that juror Y.G. was prejudiced against Minor based on the prosecutor's statement regarding the possible prosecution of Minor's brother.
With respect to the prosecutor's objection to Minor "calling me a m____f____," the record indicates that when Minor's brother was brought into the courtroom and confronted with his misconduct the discussion became heated; Minor's brother, Minor, the four attorneys, and the court all spoke at various points and, in some cases, they appeared to be talking over one another. At one point, the prosecutor said "What did you say?" and then said "What did you call me?" These comments appear out of place and nonsensical until, on the following page of the transcript, Minor said "You didn't hear me call you nothing." Immediately following Minor's statement, Minor's defense counsel said "He's come over here yelling at him while [Minor's brother] was talking." Although not clear, it appears that Minor's counsel was referring to the prosecutor's *417 allegedly yelling at Minor. The trial court attempted to regain control of a discussion that had begun to spiral out of control rapidly and instructed the parties to conduct themselves in "a civil manner." That instruction went unheeded, however, and the attorneys as well as Minor continued speaking over one another. It was at this point that the record shows the prosecutor's objection to Minor "calling him a m____f____," after which Minor's counsel objected to the prosecutor making the objection in front of juror Y.G., and asserted that they had not heard any such statement from Minor.
There is no indication in the record that juror Y.G. actually heard the prosecutor's objection. Given the confusing and disorderly discussion and the fact that people were talking over one another, it is not outside the realm of possibility that juror Y.G. did not hear it. We will not predicate error on a silent record. "[T]his Court is bound by the record on appeal; an appellate court `"may only consider the facts contained in the record on appeal, and it may not presume any facts not shown by that record and make them a ground for reversal."'" Johnson v. State, 823 So.2d 1, 22 (Ala.Crim.App.2001), quoting Pressley v. State, 770 So.2d 115, 123 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000), quoting in turn Carden v. State, 621 So.2d 342, 346-47 (Ala.Crim.App.1992).
Moreover, even assuming that juror Y.G. did hear the prosecutor's objection, it is well settled that "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Although the prosecutor's objection in this case was not during arguments to the jury, it clearly was made in the heat of debate, and we believe, if juror Y.G. heard it, she valued it at its true worth. The type of heated, speaking-over-one-another discussion that occurred in the presence of juror Y.G. was a common occurrence throughout Minor's trial. The prosecuting attorneys and the defense attorneys were zealous advocates and took issue with one another throughout the trial, not only in discussions outside the hearing of the jury, but also in front of the jury when objections were made. During closing arguments at the guilt phase, the prosecutor even apologized to the jury for his and defense counsel's "bang[ing] up on one another pretty good in front of y'all." (R. 2191.)
The trial court instructed the jury, however, that any comments made by the attorneys were not to be considered as evidence in the case. During its preliminary instructions to the jury before the guilt phase of the trial began, the trial court instructed the jury as follows:
"Please bear in mind that the things the attorneys tell you in their opening statements, for that matter, any comments they may make during the course of this trial and the things they tell you in their closing arguments [are] not evidence in the case and should not be considered by you as evidence."
(R. 736.) In its final oral charge at the conclusion of the guilt phase, the trial court instructed the jury as follows:
"Now, ladies and gentlemen, you are to base your verdict in this case on the evidence in this case.

*418 "The evidence to be considered by you is the testimony of the witnesses who have testified under oath, the exhibits that have been admitted into evidence, and presumptions of law which, in your judgment, have not been refuted by the evidence.
"You are not to consider as evidence the indictment that I have read to you, the arguments of the lawyers or the rulings of this Court."
(R. 2234-35.)
It is clear from the record that juror Y.G. took her oath as a juror seriously. Not only did juror Y.G. state that the case "weighed heavily" on her and that she was trying to do her civic duty, her actions reflected that mindset as well. Juror Y.G. promptly reported the harassment she was experiencing to the bailiff, and when the harassment continued, she reported it to the trial court. Jurors are presumed to follow their instructions, see Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.), on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), and, in this case, we have no doubt that juror Y.G. followed the instructions of the trial court not to consider statements of counsel as evidence.
Accordingly, we find no error, plain or otherwise, in the trial court's refusal to sua sponte declare a mistrial or remove juror Y.G. from the jury based on the prosecutor's comments.

VI.
Minor contends that the prosecutor made several improper remarks during closing arguments at both the guilt phase and penalty phase of the trial. (Issue VIII in Minor's brief.)
"This court has stated that `[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). `A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 528 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, `statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. `Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not *419 reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, "`[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985).

A.
Minor first contends that, during the guilt phase of the trial, the prosecutor improperly argued to the jury that Minor was guilty of killing Ebious and urged the jury to convict him of capital murder. Specifically, Minor complains that the prosecutor improperly stated "`I submit to you that the only fair and just verdict in this case is to find Willie Minor guilty of capital murder of little two-month-old Ebious Jennings' (R. 2180)"; that the prosecutor improperly "asked [the jury] to return a verdict of guilty as charged" and "to find [him] guilty of the murder of his son"; and that the prosecutor inappropriately referred to him as a "child murderer." (Minor's brief at p. 50.) Minor did not object to any of these statements by the prosecutor; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
In context, the prosecutor stated the following during his rebuttal closing argument:
"You have been a jury that has been engaged with the facts of this case from the moment you took your seat in this jury box, and I want you to stay engaged. I want you to listen to what that Judge says and then I want you to go back in that jury room and I want you to return a fair and just verdict in this case and I submit to you that the only fair and just verdict in this case is to find Willie Minor guilty of capital murder of little two-month-old Ebious Jennings.

"Mr. Turberville stands up here and talks to you about the thousands of defendants that he has represented and how scared he is today because never in his life has he ever believed a defendant to be any more innocent than Willie Minor in this case.
"Well, ladies and gentlemen of the jury, let me tell you what scares me today. What scares me today is that in the twenty-three years that I have been a prosecutor, in sixteen years that I have been a prosecutor of child abuse cases, I have never seen a child abuse case of this magnitude.
"And what scares me, ladies and gentlemen of the jury, is that you will buy this cloud of smoke that this defense attorney has filled this courtroom with and you will let a child murderer walk out that door. And what scares me is that if he walks out that door, justice walks out right along side him. That's what scares me.
"We have met our burden of proof in this case beyond a reasonable doubt and to a moral certainty.
"I told you when I spoke with you in opening statement that I would come back at the end of the presentation of the evidence in this case and I would ask you to return a verdict of guilty as charged, and that is exactly what I ask you to do now.

"I am asking that at the conclusion of the evidence and the Judge's charge that you go back there and you find that *420 man guilty of the murder of his son. It's hard to conceive that a parent is capable of doing such a thing. It used to be hard for me to conceive of it; it isn't anymore."
(R. 2179-81.) (Portion complained of by Minor emphasized.)
"Generally, the prosecutor is in error by exhorting the jury to `do what's right,' or to `do its job,' if that exhortation `impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law.'" McNair v. State, 653 So.2d 320, 339-40 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala.Crim.App.1990). However, it is not improper for a prosecutor to argue to the jury that a defendant is guilty or to urge the jury to find the defendant guilty of the crime charged so long as that argument is based on the evidence; in fact, that is exactly what a prosecutor is supposed to do during closing argument. See Galloway v. State, 484 So.2d 1199 (Ala.Crim.App.1986), and the authorities cited therein. See also Broadnax v. State, 825 So.2d 134, 183 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), and Melson v. State, 775 So.2d 857, 889-90 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000). Moreover, "`the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.'" Henderson v. State, 584 So.2d 841, 857 (Ala.Crim.App.1988), remanded on other grounds, 584 So.2d 862 (Ala.1991), on remand to, 587 So.2d 1071 (Ala.Crim.App.1991), remanded on other grounds, 616 So.2d 348 (Ala.1992), on return to remand, 616 So.2d 352 (Ala.Crim.App.1993), quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.1988). See also Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, "`She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide'  did not transcend the bounds of legitimate argument"); Maples v. State, 758 So.2d 1, 58 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999) (prosecutor's comment that the defendant "`is a murderer; a capital murderer'" was not improper); Melson, 775 So.2d at 889 (prosecutor's reference to the defendant as a "`cold-blooded murderer'" with "`no remorse'" was not improper); Thomas v. State, 766 So.2d 860, 933-34 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000) (prosecutor's references to defendant as a "`street punk,'" "`criminal,'" "`thug,'" "`murderer,'" and "`manipulator'" were not improper); and Kinard v. State, 495 So.2d 705, 711 (Ala.Crim.App.1986) (prosecutor's reference to defendant as "`an unmitigated liar and murderer'" was not improper). The prosecutor's comments were supported by the evidence in this case and were not improper.
We find no error, much less plain error, as to this claim.

B.
Minor next contends that, during the guilt phase of the trial, the prosecutor improperly "admonished the jury not to let the defendant get away with it because of the memory of Ebious Jennings." (Minor's brief at p. 50.)
During the prosecutor's rebuttal closing argument, the following occurred:
"[Prosecutor]: Mr. Turberville says that this is the most important decision that you will ever make in your lives, and it is important to the life of Willie Minor. Yes. Yes, it is important to the life of Willie Minor.
"He wants to get away from the consequences of his behavior for what he *421 did to this defenseless, innocent little two-month-old child. Please don't let him get away with that because your decision is also important for the sake of the memory of Ebious Jennings.

"[Defense counsel]: Your Honor, I would object to that. Their decision is purely to find the guilt or innocence of the accused. I would object to the argument. It is improper argument.
"THE COURT: Well, I will overrule."
(R. 2182-83.) (Portion complained of by Minor emphasized.)
We agree with the State that, when viewed in context, the prosecutor's comment was a proper appeal for justice. "There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty." Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998). See also Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001). We find no error as to this claim.

C.
Minor also contends that the prosecutor improperly shifted the burden of proof to the defense and "attacked the integrity of all defense lawyers" during his rebuttal closing argument at the guilt phase of the trial. (Minor's brief at p. 50.)
During the prosecutor's rebuttal closing argument, the following occurred:
"[Prosecutor]: Now, I am going to submit to you any time a defense attorney stands up here and says I don't mean to say, but, you can know that that but is exactly what he means.
"And when he said: Now, I don't mean to say Lakeisha Jennings killed her child, but, that's exactly what he means for you to conclude in this case.
"It is an either-or situation, bottom line. Either Willie Minor did it or Lakeisha Jennings did it, bottom line, and that is what [defense counsel] is putting before you. I don't mean to say that she did, but. I don't mean to question, but why didn't the State ask when did she go do the laundry?
"Every time [defense counsel] stood up here and said, well, the government lawyers, my God, I am a government lawyer. Every time that government lawyer stood up there and didn't ask a question of this type or of that type, you know, guess who had the opportunity and the ability to ask those same questions.

"And don't you know if he thought the answer would make a difference to his client, he would have asked those questions? But he didn't.

"I submit to you that the laundry basket in one of the photographs is nothing more than a red herring.

"There is a sign on the wall up here that says no smoking. I am old enough that I can still remember the days when lawyers could smoke in the courtroom. There were ashtrays on the tables. There were cuspidors, there were spittoons. Lawyers actually used to chew tobacco in the courtroom.
"Those days have passed. I can no longer smoke in the courtroom. But let me tell you who does smoke in the courtroom in every case, that's defense attorneys and that's the cloud of smoke that they raise with one red herring after another.

"[Defense counsel]: Your Honor, I would object.
"[Prosecutor]: Anything 
"[Defense counsel]: Excuse me, Mr. [prosecutor].
"Your Honor, I object to this line of  of argument in putting  saying that defense *422 lawyers with lies [sic] and try to bring in lies.
"I would also object to this line of argument in that  that defense attorneys didn't ask questions. The defense has no burden of proof whatsoever, we don't have to ask anything and I would object to this  to this argument, Your Honor, I think its improper.
"THE COURT: Well, ladies and gentlemen, it's true that the State of Alabama does have the burden of proof.
"Of course, this is closing argument of the lawyers and things the lawyers tell you is not evidence in the case and you have heard the evidence and they are allowed to argue any  any reasonable inference. Whether you feel the inference is justified would be for you, the jury, to decide.
"[Prosecutor]: I would never say we didn't have the burden of proof that we do. We've got it beyond a reasonable doubt and to a moral certainty. We've got it. I accept it in this case as I do in every case and, once again, I submit to you that we have met it.
"And whether somebody asks a question or not, that is not a matter of burden of proof. [Defense counsel] could have asked those questions had he wanted to and he chose not to."
(R. 2183-86.) (Portion complained of by Minor emphasized.)
As the record clearly reflects, Minor's objection to the prosecutor's reference to Minor's failure to question a witness was untimely. See, e.g., Watson v. State, 439 So.2d 762, 769 (Ala.Crim.App.1983) ("To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent."). In addition, the trial court never ruled on either of Minor's objections. See, e.g., Finney v. State, 860 So.2d 367, 383 (Ala.Crim.App.2002), and Harris v. State, 745 So.2d 940 (Ala.Crim.App.1999) (both holding that a defendant must receive an adverse ruling on an objection to the prosecutor's closing argument in order to preserve the issue for review). Therefore, neither of Minor's arguments were preserved for review, and we review them under the plain-error rule. See Rule 45A, Ala.R.App.P.
We find no impropriety in any of the comments complained of by Minor. The prosecutor's statements that the defense could have questioned Lakeisha about her doing the laundry on the day of Ebious's death did not improperly shift the burden of proof to Minor, and was a proper reply in kind to defense counsel's closing argument. During the defense's closing argument, defense counsel repeatedly suggested that either Lakeisha or someone else who may have been at the apartment that day had killed Ebious. Although counsel specifically stated that he was not "outright accus[ing]" Lakeisha of killing Ebious (R. 2116), counsel stated that, while Minor was out having a good time playing basketball with his friends, Lakeisha had been stuck at home with her three children and was, thus, "not a happy camper." (R. 2118.) Counsel repeatedly stated that Lakeisha had had a bad day on April 15, 1995, while Minor had been out having fun. (R. 2096; 2117; 2121; and 2173.) Counsel also suggested that, at some point during the day, Lakeisha may have left her three children alone or had someone watch the children while she went to do the laundry. Counsel referred to a photograph taken of Lakeisha's apartment after Ebious's death that showed a laundry basket of clean clothes. Counsel repeatedly pointed out that the prosecutor failed to question Lakeisha about where she had done the laundry, despite the fact that her apartment did not have a washer and dryer, and that the prosecution failed to question Lakeisha regarding whether she had taken the children *423 with her when she did the laundry or had left them at home, either alone or with someone. Defense counsel stated that the prosecution "never told us who, if anybody, stayed with those children" while Lakeisha did the laundry (R. 2118); that the jury "didn't get the whole truth about it" (R. 2121); and that "we don't know who kept the children while she went to the laundry room." (R. 2173.)
In response, the prosecutor properly pointed out that defense counsel, just as easily as the prosecutor, could have questioned Lakeisha regarding her doing the laundry but did not do so. That comment was a legitimate comment on the lack of evidence to support Minor's theory that Ebious's injuries were inflicted by someone else while Lakeisha was doing laundry. "Rather than shifting the burden of proof, the[] statement[] constitute[d] an effort to meet the prosecutor's own burden of proof by commenting on the lack of evidence." Miles v. State, 715 So.2d 913, 917 (Ala.Crim.App.1997) (holding that prosecutor's reference during closing arguments to the defense's failure to question a certain witness was a permissible comment on the lack of evidence to support the appellant's testimony). In addition, the comment was a proper reply in kind to defense counsel's suggestion that the prosecutor was withholding the truth by not asking Lakeisha questions regarding her doing the laundry. "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994). Moreover, as the State correctly points out in its brief to this Court, any possible confusion about the burden of proof engendered by the prosecutor's comment was cured by the trial court's prompt instructions to the jury that the burden of proof was on the State and that statements of counsel are not evidence. See, e.g., Hammonds v. State, 777 So.2d 750, 765 (Ala.Crim.App.1999), aff'd, 777 So.2d 777 (Ala.2000) ("A reversal may be prevented if the trial court sustains an objection to the improper comment and properly and appropriately instructs the jury as to the impropriety of the remark."); Melson, 775 So.2d at 885 ("We do not find that the [prosecutor's] brief and isolated comment [that `[i]t is very difficult to prove someone is innocent when they are not'], in conjunction with the trial court's proper instructions to the jury concerning the burden of proof, was so egregious that it amounted to a miscarriage of justice."); and Hannah v. State, 518 So.2d 182, 185 (Ala.Crim.App.1987) ("The trial judge is in the best position to determine whether the prejudicial effects of an improper remark can be eradicated by instructions to the jury, and his determination should be accorded great deference.").
The prosecutor's statement "`but let me tell you who does blow smoke in the courtroom in every case, that's defense attorneys and that's the cloud of smoke they raise with one red herring after another'" was likewise not improper. Contrary to Minor's contention, neither the purpose nor the effect of the prosecutor's comment was to "attack[] the integrity of all defense lawyers." (Minor's brief at p. 50.) Rather, when viewed in context, it is clear that the prosecutor was again merely commenting on the lack of evidence to support Minor's theory that Lakeisha or someone else other than Minor had killed Ebious. "One of the most prevalent arguments to a jury is that the position and argument of the adversary is unwarranted, silly, fanciful or illogical." Crook v. State, 276 Ala. 268, 270, 160 So.2d 896, 897 (1963). "[A] prosecutor's remarks during closing argument pointing out the flaws in the defense's theory of the case do not *424 constitute improper argument." Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000). See also Hall v. State, 820 So.2d 113, 142 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001) (prosecutor's reference to the defense as a "smoke screen" was not improper) (emphasis omitted); West v. State, 793 So.2d 870, 884 (Ala.Crim.App.2000) (prosecutor's comment that a statement made by defense counsel was "part of the fairy tale that y'all have been hearing from the defense side" was not improper or prejudicial) (emphasis omitted); Woodall v. State, 730 So.2d 627, 650 (Ala.Crim.App.1997), aff'd in pertinent part, rev'd on other grounds, 730 So.2d 652 (Ala.1998) (prosecutor's comment that defense's theory was "an attempt to sell the jury `oceanfront property in Arizona'" was not improper or prejudicial); Smith v. State, 588 So.2d 561, 569 (Ala.Crim.App.1991) (prosecutor's reference to defense counsel as "`merchants of reasonable doubt'" was not improper); Haywood v. State, 501 So.2d 515, 519 (Ala.Crim.App.1986) (prosecutor's comment that "`devious tricks to distort the truth'" had occurred during the trial was not improper); Thomas v. State, 393 So.2d 504, 508-09 (Ala.Crim.App.1981) (prosecutor's comments "`Judge, I think this lawyer needs to have a little lesson in proper evidence'" and that trial counsel had "`lied'" were not prejudicial); and Crook, 276 Ala. at 269, 160 So.2d at 896-97 (prosecutor's comments "`You don't listen to some new fangled, disgusting theory that springs out from the minds of the imaginative lawyers'" and "`We aren't supposed to tamper around with any kind of disgusting new fangled theory'" were not improper) (emphasis omitted).
Moreover, even if this comment were to be construed as an attack on defense attorneys, it was a proper reply in kind to defense counsel's numerous disparaging remarks during his closing argument about the prosecutors in this case as well as prosecuting attorneys in general. Defense counsel stated that "the prosecution does so many things to affect the jurors psychologically" (R. 2107); that prosecutors "play a mind game" and "know how to do it" (R. 2108); that the prosecutors in this case "know how to operate ... [t]hey are good ... they could sell you insurance" (R. 2133); that the prosecutors in this case were "messing with [the jury's] mind" (R. 2160); and that the prosecutors were "going to show [the jury] a dog and pony show." (R. 2168.) In addition, defense counsel argued to the jury that one of the two prosecutors in this case was going to get up and cry during closing arguments, that "the tears will start flowing" because it was common knowledge that the prosecutor cries during closing arguments in every case he tries. (R. 2111.)
"`[T]he propriety of argument of counsel to the jury depends upon the particular issues, fact, and atmosphere of each case.'" McNair v. State, 653 So.2d 320, 339 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting Bryson v. State, 264 Ala. 111, 114, 84 So.2d 785, 788 (1955).
"This court has held on many occasions that in order to determine whether a statement of the prosecutor was improper, `it must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor's argument was an answer.' Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Gibson v. State, 347 So.2d 576 (Ala.Crim.App.1977); Rutledge v. State, [482 So.2d 1250] (Ala.Crim.App.1983). The rule in Alabama is that `remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds *425 for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements.' Shewbart v. State, 33 Ala.App. 195, 32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244 (1947); Camper v. State, 384 So.2d 637 (Ala.Crim.App.1980); Wilder v. State, 401 So.2d 151 (Ala.Crim.App.), cert. denied, 401 So.2d 167 (Ala.1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586 (Ala.Crim.App.1983); Rutledge, supra."
Henderson v. State, 460 So.2d 331, 333 (Ala.Crim.App.1984). "`When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.'" Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986), quoting DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469 (1982-83). See also Knight v. State, 50 Ala.App. 39, 276 So.2d 624 (Crim.App.1973) (prosecutor's purported attack on defense counsel during closing arguments was not improper where it was a reply in kind to defense counsel's argument).
We find no error, plain or otherwise, as to this claim.

D.
Minor contends the prosecutor improperly referred to him as a "monster" during his closing argument at the guilt phase of the trial. (Minor's brief at p. 51.) Because Minor did not object to this alleged comment, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
At the conclusion of his rebuttal closing argument, the prosecutor stated:
"As [the other prosecuting attorney] told you, the Judge is going to charge you that we do not have to prove what Willie Minor's motive was in causing the death of Ebious Jennings. That's true. We do not. We only have to prove that he did.
"But I submit to you, having done this so many years, that this is it: There's some people on this earth that are not like you and me; they don't have a conscience. A man much smarter than me named John Steinbeck wrote a book called East of Eden. It's about the choices that people make between good and evil, and in it he said:
"`As a child may be born without an arm, so one may be born without kindness or the potential of conscience. To a monster, the norm must seem monstrous since everyone is normal to himself. To a man born without conscience, a soul-stricken man must seem ridiculous. To a criminal, honesty is foolish. You must not forget that a monster is only a variation and that, to a monster, the norm is monstrous.'
"Now, having that in mind, keeping those words of Steinbeck in mind, I want to take you back to the interview room of April the 17th when Dorman Adams comes in and says: Turn around, good buddy. I am going to have to put the cuffs on you. I am afraid you're under arrest.
"And how did this man refer to his child? `I didn't kill that damn baby. I didn't kill my damn baby.' That, ladies and gentlemen of the jury, is a man without conscience."
(R. 2219-20.)
As the State correctly points out in its brief to this Court, while the word "monster" was used by the prosecutor when he was quoting John Steinbeck, the prosecutor never referred to Minor as a monster. He referred to Minor as a *426 man without a conscience, which was a reasonable inference from the evidence.
"`"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference."' Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).
"`"The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Crim.App.1978)."'
"Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999), writ quashed, 767 So.2d 1142 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
Johnson v. State, 823 So.2d 1, 47 (Ala.Crim.App.2001).
We find no error, much less plain error, as to this claim.

E.
Minor contends that, during the penalty phase, the prosecutor improperly argued to the jury that "the words of Christ relating to turning the other cheek meant the community should take revenge, not the individual" and that "Christ would have `done what it took to see that a wolf didn't harm his flock of sheep.'" (Minor's brief at p. 51.) Because Minor did not object to these comments, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
In context, the prosecutor stated the following during his rebuttal closing argument at the penalty phase of the trial:
"[Defense counsel] gets up here and he speaks to you about Jesus Christ and that Jesus Christ is the epitome of love and mercy. And for the first time in this courtroom since the beginning of this case, I want you to know that I agree with [defense counsel], that Jesus Christ is the epitome of love and mercy.
"And if I were a member of the jury, one question I might ask myself is: What does the Bible tell me about the sanctity of human life? And there are many references in the Bible to that. There are many references that Christ gave about the sanctity of human life.
"In Matthew, Jesus Christ said: `Whoever shall smite thee on the right cheek, turn to him the left one also.'
"What did he mean by that? He was giving the people a lesson that they should personally not take revenge into their hands. That is what he meant by turning the other cheek.
"He never meant, I submit to you, that a community should not protect itself from one who would harm its citizens.
"What did Jesus Christ do? He was a carpenter and he was a shepherd. He *427 had a flock of sheep when he was a young man.
"What would Jesus Christ have done if a wolf had fallen upon his flock? And I submit to you that Jesus Christ would have done what it took to see that that wolf did not harm his flock.
"Ladies and gentlemen of the jury, in humanity today, Christ's flock is all of us and there has been a wolf among us who has killed one of our lambs. That lamb is Ebious Jennings and the wolf who killed him is Willie Minor."
(R. 2508-10.)
As the State correctly points out in its brief to this Court, the prosecutor's argument was a proper reply in kind to defense counsel's argument. During opening statements at the penalty phase of the trial, defense counsel stated "all of you are Christian and the thing about Christ is love. It's love. It's mercy. The highest standard there is, the highest level you can go to, the most Christ-like is mercy." (R. 2285.) During closing argument at the penalty phase, defense counsel stated "God put us here, ladies and gentlemen, and God has to take us away." (R. 2489.) Later, when asking the jury to show mercy on Minor, defense counsel stated:
"But you know, during this trial, they talked about  I think it was [the prosecutor] said that all [defense attorneys] put smoke up there on that stand. You know, the greatest person that ever lived, Jesus Christ, did not have a defense attorney. He had lots of prosecutors. He didn't have a defense attorney.
"Two things that Christ had to preach was love and mercy, and there were no exceptions with him. None. None whatsoever. When that person next to him on the cross turned to him, a hardened criminal, he gave him mercy.
"He said to God: Forgive them for they know not what they are doing. There was mercy. Love and mercy. Love and mercy. That's all there is to being Christian. That's all there is."
(R. 2504-05.)
In addressing a similar issue in Melson, this Court stated:
"Melson further contends that the prosecutor improperly argued to the jury during his rebuttal argument at the penalty phase of the trial that Melson should be sentenced to death in accordance with God's laws. Specifically, Melson contends that the prosecutor's comments urged the jury to recommend a death sentence based on passion and prejudice; that the comments lessened the jury's responsibility in recommending death by indicating that the jury was bound by God's laws to do so; and that the comments encouraged the jury to draw on religious law, which Melson claims was a factor that should not have been considered because it was not evidence in the case....
"In support of his claims, Melson specifically refers in his brief to a small portion of the prosecutor's rebuttal argument. In deciding this issue, we find it important to discuss the argument by Melson's counsel during closing arguments at the penalty phase, an argument not mentioned by Melson in his brief on appeal. Almost all of Melson's counsel's argument dealt with God's mercy....
"....
"... [T]he record reveals that Melson's counsel put the prosecutor in the position of having to reply to his arguments. As the state correctly points out in its brief to this court, the prosecutor never mentioned `God' in closing argument to the jury until he responded to Melson's counsel's arguments in his rebuttal comments[.] ...

*428 "We find that the prosecutor's comments, when taken in context with the entire closing arguments, were proper as a reply in kind to the Biblical argument made by Melson's counsel during closing argument that no man `dare judge the life of another. That's up to God.' (R. 2124.) `"A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel. See Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984)." DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App.1993).' Taylor [v. State], 666 So.2d [36,] 65 [(Ala.Crim.App.1994)]. The prosecutor's argument permissibly sought to differentiate between God's laws and man's laws, so as to counter the argument by Melson's counsel that only God can judge and punish man. See Daniels v. State, 650 So.2d [544], 561 (Ala.Cr.App.1994).
"Furthermore, `"[a]rgument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings." General appeals for law enforcement are within the permissible range of a prosecutor's closing argument.' Williams v. State, 710 So.2d 1276, 1301 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (citations omitted)."
775 So.2d at 891-93. See also Ivery v. State, 686 So.2d 495, 510-11 (Ala.Crim.App.1996) (prosecutor's references to God's law and to religion were not improper).
Similarly, here, the prosecutor did not make any religious argument at the penalty phase of the trial until defense counsel mentioned Jesus Christ during his closing argument at the penalty phase. In fact, a large portion of defense counsel's closing argument at the penalty phase was religious in nature. When viewed in context, then, the prosecutor's comments during rebuttal closing argument were proper replies in kind to defense counsel's religious argument that "[l]ove and mercy" is "all there is." (R. 2505.)
We find no error, plain or otherwise, as to this claim.

F.
Minor contends that, during closing arguments at the penalty phase of the trial, the prosecutor improperly "asked that Mr. Minor suffer the death penalty." (Minor's brief at p. 51.) Specifically, Minor complains about the following statement by the prosecutor during his rebuttal closing argument:
"I want you to know that when I stand up here and I ask you to recommend to this Judge that this man should suffer the death penalty, I am sorry on behalf of his family. I take no pleasure in the pain that these proceedings have caused them."
(R. 2510.) Because Minor did not object to the prosecutor's statement in this regard, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
It is not improper for a prosecutor to urge the jury to return a recommendation for the death penalty. "Of course, a prosecutor seeking a death penalty will argue that the aggravating factors outweigh the mitigating facts and that the defendant should receive the death penalty." Smith v. State, 727 So.2d 147, 171 (Ala.Crim.App.1998), aff'd, 727 So.2d 173 (Ala.1999), overruled on other grounds, Ex parte Borden, 769 So.2d 950 (Ala.2000). See also Wilson v. State, 777 So.2d 856, 897 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000) (prosecutor's statement during closing argument at the penalty phase "`I ask that you do your duty and that you *429 will return to this honorable court a recommendation that Joey Wilson be put to death'" was not improper) (emphasis omitted), and Hall, 820 So.2d at 143-44 (prosecutor's closing argument at the penalty phase of the trial that the death penalty was warranted under the facts of the case and that the jury should recommend it was not improper). We find no error, plain or otherwise, as to this claim.

G.
Minor contends that, during the penalty phase, the prosecutor improperly told the jury that "the legislature meets every year in regard to a possible parole of those serving life without parole." (Minor's brief at p. 51.)
During the prosecutor's rebuttal closing argument, the following occurred:
"Now, Mr. Turberville has talked with you about what a bad place prison is and how it's not the Hilton [hotel] and he's going to have a terrible life down there if you recommend life without parole and that there's never been anyone sentenced to life without parole who's ever been let go. Well, the legislature meets every year. That's all I've got to say.
"MR. TURBERVILLE: Your Honor, I would object to that. That is inappropriate argument. I think there are many cases that are on that 
"MR. SULLIVAN: I will withdraw it.
"MR. TURBERVILLE: It  I would ask for a mistrial.
"THE COURT: Disregard the prosecutor's last comment.
"MR. TURBERVILLE: Judge, I would ask that the jury be polled if that would affect them in any way.
"THE COURT: Ladies and gentlemen, as I call your name, indicate whether or not you would be able to disregard the prosecutor's last comment."
(R. 2513-14.) At that point, each juror indicated that he or she could disregard the prosecutor's comment.
The prosecutor's comment was clearly intended to place doubt into the minds of the jurors as to whether Minor would at some point in the future be released from prison based on a change in the law if he were sentenced to life imprisonment without the possibility of parole instead of death. Therefore, the comment was improper.
"Informing the jury that the legislature may change the definition of life imprisonment without parole in the future is improper. `It has long been the law of this State that comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case, constitute improper argument.' Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984); Eaton v. State, 278 Ala. 224, 177 So.2d 444 (1965); see also Murray v. State, 359 So.2d 1178 (Ala.Cr.App.1978)."
Pressley v. State, 770 So.2d 115, 125 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.2000).
We recognize that the prosecutor's argument was made in response to defense counsel's statement during his closing argument that "a person with life without parole in Alabama has never been paroled and can't be paroled according to the law." (R. 2487.) We likewise recognize that "argument of counsel that, in fact, is a reply in kind to an earlier argument of opposing counsel would not be subject to objection, even though such argument otherwise would be impermissible." Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala.1984) (emphasis omitted). However, the reply-in-kind doctrine does not *430 apply when the impermissible comment is in reply to a proper argument by the opposing party, as was the case here. As the Alabama Supreme Court explained in Ex parte Rutledge:
"The `reply in kind' doctrine is based on fundamental fairness. Where counsel for one party permits counsel for the opposing party to make impermissible remarks to the jury without interposing an objection, the law implicitly reserves to the former the right to reply in kind, albeit equally impermissible, to the argument of the latter. As is ofttimes the case, an objection to an illegal argument, although sustainable, is ineffective to eradicate the harm done. Counsel, as a matter of trial strategy, may elect in such cases not to interpose an objection, wait his turn, and reply in kind, thus commenting upon matters that otherwise he could not argue.
"It is a misapplication of this rule, however, to uphold an illegal argument under the guise of `reply in kind,' where the initial argument, to which the purported reply is addressed, is itself a legally permissible comment to the jury."
482 So.2d at 1264. See also Ex parte Burgess, 827 So.2d 193 (Ala.2000), and Jackson v. State, 629 So.2d 748 (Ala.Crim.App.1993).
Although the prosecutor's comment was clearly improper, that does not end our analysis.
"`[A] mistrial is a drastic remedy, to be used only sparingly and only to prevent manifest injustice.' Ex parte Thomas, 625 So.2d 1156, 1157 (Ala.1993). A mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instructions or other curative actions of the trial court. Nix v. State, 370 So.2d 1115, 1117 (Ala.Crim.App.), cert. denied, 370 So.2d 1119 (Ala.1979). If an error can be effectively cured by an instruction, a mistrial is too drastic a remedy and is properly denied. Thompson v. State, 503 So.2d 871, 877 (Ala.Crim.App.1986)."
Ex parte Lawrence, 776 So.2d 50, 55 (Ala.2000). A "trial court's immediate curative instruction concerning the prosecution's comment creates a prima facie presumption against error." Smith v. State, 756 So.2d 892, 928 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.2000). As this Court noted in Thomas v. State, 766 So.2d 860 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000):
"`[I]t "is not enough that the prosecutor's remarks were undesirable or even universally condemned."' Darden v. Wainwright, 477 U.S. [168,] 181, 106 S.Ct. 2464 [(1986)] (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir.1983)). Rather the relevant question is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Id. In determining whether appellate counsel were ineffective in failing to contest this issue, we start with the following principle:
"`It is a general rule that where prejudicial statements are made in the heat of argument, even though improper, in accommodation of our adversary system, such statements are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both.'
"Allred v. State, 291 Ala. 34, 38, 277 So.2d 339 (1973), cert. denied, 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86 (1975). In reviewing the prosecutor's improper reference during voir dire to the possibility of parole, this court in Prince v. State, 623 So.2d 355, 358-59 (Ala.Cr.App.1992), *431 made the following statement, which we find to be applicable here:
"`"There is no question but that the argument of the solicitor to the effect that a man sentenced to the penitentiary will at some time become eligible for pardon or parole was improper....
"`"The remarks of the solicitor were of the class of improper argument which may be remedied or their evil effect eradicated by instructions of the court."
"`Lee v. State, 265 Ala. 623, 629, 93 So.2d 757, 763 (1957). See also Eaton v. State, 278 Ala. 224, 227, 177 So.2d 444, 448 (1965)....
"`....
"`Although erroneous, "[a]rgument in the nature of that under consideration is not so inflammatory and prejudicial that its harmful quality cannot be eradicated." Murray [v. State], 359 So.2d [1178,] 1181 [(Ala.Cr.App.1978)]. See Doyle [v. State], 487 So.2d [996,] 998-99 [(Ala.Cr.App.1986)] (judge's action in sustaining objection and stating, "Let's stick to the evidence" sufficient to cure error). "Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action [in immediately sustaining defense counsel's objection]." Hooks v. State, 534 So.2d 329, 361 (Ala.Cr.App.1987), affirmed, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 ... (1989). See Thomas v. State, 373 So.2d 1149, 1159-60 (Ala.Cr.App.1979), affirmed, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 ... (1980).'
"In Hooks v. State, 534 So.2d 329, 360-61 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989), a capital case, this court reviewed the following comments of the prosecutor: `[Defense counsel] says [the defendant will] be locked up where he can't get into trouble. I wish that it were true.... Even in prison.' The court, noting that the trial court sustained the objection, held, `Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action.' Id. at 361. Compare [Ex parte] Rutledge [, 482 So.2d 1262 (Ala.1984)]."
766 So.2d at 957-58.
After reviewing the record, we conclude that the trial court's prompt action in instructing the jury to disregard the prosecutor's remark was sufficient to eradicate any prejudice to Minor from the prosecutor's comment. Jurors are presumed to follow their instructions, see, e.g., Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.1994), on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), and, in this case, each juror specifically stated that he or she could, in fact, disregard the comment. Therefore, Minor is entitled to no relief on this claim.

H.
Minor also contends that, during the penalty phase, the prosecutor improperly argued to the jury that the jurors "would be telling [the] defendant by their decision on life or death if he had done good or evil." (Minor's brief at p. 51.)
At the conclusion of the prosecutor's rebuttal closing argument, the following occurred:
"MR. SULLIVAN: Many have spoken for Willie Minor and I ask who will *432 speak for Ebious? Who will render justice in this case?
"You know, I really like that book by John Steinbeck that I read to y'all from yesterday, and there is another part of that book and it goes like this:
"`A child may ask what is the world's story about?' Ebious might ask what is the world's story about? `Humans are caught in their lives, in their thoughts, in their hungers, in their ambitions, in their avarice, in their cruelty and in their kindness and generosity, too, in a net of good and evil. There is no other story. A man, after he has brushed off the dust and chips of his life, will have left only the hard, clean questions: Was it good or was it evil? Have I done well or have I done evil?'
"And today, ladies and gentlemen of the jury, you will need to answer those questions for Willie Minor. You will have to tell him by this recommendation whether he has done good or evil.
"MR. TURBERVILLE: Your Honor, I object to that. Your Honor, that is a misstatement and that is  that is just purely putting in prejudice. And he talks about a guilt trip on the jury, not telling if he's done good or evil in his life. If they think that he is a capital murderer, obviously, he's done evil. But the question is do[] the aggravating circumstances outweigh the mitigating circumstances and I would ask that  well, I would ask for a mistrial.
"THE COURT: I will overrule the mistrial. I think that you have done a pretty good job of instructing the jury, so let's move on.
"MR. SULLIVAN: Ebious can't sit here and ask you to do justice in this case, but I will speak for Ebious and, on his behalf, I ask you to return an advisory verdict recommending capital punishment.
"It's not your responsibility that I ask you to do that. It's not your responsibility that you are in the position where you must make that decision. It's that man's responsibility.
"Do what's right. I know you'll do what's right.
"Thank you."
(R. 2528-30.)
We agree with the State that there was nothing improper about the prosecutor's remarks. When read in context, it is clear that the prosecutor was making a call for justice and for the jury to perform its duty, both of which are proper subjects of closing argument. See Centobie v. State, 861 So.2d 1111, 1132 (Ala.Crim.App.2001) (finding no error in the prosecutor's "appeal to the jury for justice in law enforcement and for the jury to discharge its duties according to law and evidence"); Baker v. State, 906 So.2d 210, 271 (Ala.Crim.App.2001), rev'd on other grounds, 906 So.2d 277 (Ala.2004) (finding no error in the prosecutor's "appeal to the jury for justice in law enforcement, and for the jury to discharge its duties according to the law and evidence"); Price, 725 So.2d at 1033 ("There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty.").
Moreover, even if we were to assume that the prosecutor's comments were improper, as noted above, a mistrial is a drastic remedy and is properly denied if the prejudice can be eradicated by proper instructions or other curative measures by the trial court. See Ex parte Lawrence, 776 So.2d at 55. In this case, the trial court denied Minor's motion for a mistrial, and, although the court did not give a curative instruction to the jury, it correctly noted that the content of Minor's objection had effectively instructed the jury. "The trial court is in the best position to determine *433 when closing arguments are prejudicial and what curative measures are necessary." Melson, 775 So.2d at 881.
We find no error as to this claim.

I.
Finally, Minor contends that the cumulative effect of all of the prosecutor's allegedly improper arguments warrants reversal of his conviction and sentence. However, after thoroughly reviewing the record and based on our discussion above, we have found only the single improper argument discussed in Part VI.G. of this opinion. Therefore, Minor's contention that there was a cumulative prejudicial effect resulting from multiple improper arguments is without merit.

VII.
Minor contends that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that his sentence of death be vacated. (Issue I in Minor's supplemental brief.) Specifically, he argues that "[b]ecause the statutory aggravating factors operate as the functional equivalent of an element of a greater offense in Alabama just as they did under Arizona's sentencing scheme, the Sixth Amendment requires that they be found by a jury, and that a jury, not a judge, make the ultimate factual determination about the existence of those factors." (Minor's supplemental brief at pp. 9-10.)
Minor's argument is meritless. This Court has specifically held that "the Supreme Court's decision in Ring did not invalidate Alabama's law that vests the ultimate sentence determination in the hands of the trial judge and not a jury." Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002). See also Tomlin v. State, 909 So.2d 213, 281 (Ala.Crim.App.2002)(opinion on rehearing), rev'd on other grounds, 909 So.2d 283 (Ala.2003) ("The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code 1975  commonly referred to as the judicial override statute  against constitutional attack.").
Moreover, as this Court explained in Moody v. State, 888 So.2d 532 (Ala.Crim.App.2003):
"In Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002),] the United States Supreme Court overruled Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to the extent that it allowed the judge, not the jury, to find an aggravating circumstance that supported a death sentence and decided that its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applied to Arizona's death-penalty scheme. See Ring, 536 U.S. at 589, 122 S.Ct. at 2432 (`Capital defendants, no less than non-capital defendants... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.'). Apprendi had announced the rule that `[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added); see also Ring, 536 U.S. at 601-02, 122 S.Ct. at 2439.
"Under Alabama law, at least one aggravating circumstance under § 13A-5-49, Ala.Code 1975, must exist in order for a defendant convicted of a capital offense to be eligible for a sentence of *434 death. Ex parte Waldrop, 859 So.2d 1181, 1187 (Ala.2002), citing § 13A-5-45(f), Ala.Code 1975 (providing that when a defendant has been convicted of a capital offense, `[u]nless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole')....
"....
"In Stallworth [v. State, 868 So.2d 1128 (Ala.Crim.App.2003) (opinion on second return to remand)], this court found that while the Supreme Court in Ring extended Apprendi to death-penalty cases, it did not purport to alter the express exemption in Apprendi for the fact of a prior conviction, which the Supreme Court had earlier recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). We stated:
"`[O]ne of the aggravating circumstances in this case related to a prior conviction  that the capital offense was committed by a person under sentence of imprisonment. See § 13A-5-49(1), Ala.Code 1975. The Apprendi Court specifically excluded from its holding prior convictions. The Apprendi Court stated, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The Court left untouched its holding in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), that an increase in a sentence related to recidivism is left to the trial court. As the Maryland Court of Appeals recognized after Apprendi:

"`"The rule that prior convictions do not have to be proven to a jury beyond a reasonable doubt was first recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). There, the Supreme Court emphasized that questions related to recidivism have traditionally been decided by the sentencing court rather than the jury. Justice Breyer, delivering the opinion of the Court, wrote:
"`"`First, the sentencing factor at issue here  recidivism  is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. Consistent with this tradition, the Court said long ago that a State need not allege a defendant's prior conviction in the indictment or information which alleges the elements of an underlying crime, even though the conviction was necessary to bring the case within the statute. That conclusion follow[s]... from the distinct nature of the issue, and the fact that recidivism does not relate to the commission of the offense, but goes to the punishment only, and therefore ... may be subsequently decided.'
"`"Id. at 243, 118 S.Ct. at 1230-31, 140 L.Ed.2d 350 (emphasis in original) (internal quotation marks and citations omitted [in Stewart]).
"`"In Apprendi, the Court emphasized that it was not overruling Almendarez-Torres. Apprendi, 530 U.S. at 489, 120 S.Ct. at 2362, 147 L.Ed.2d 435. In fact, the Court reiterated that recidivism is a traditional grounds for a sentencing court's increasing an offender's sentence, and that recidivism does not relate to the commission of the offense. *435 Id. at 488, 120 S.Ct. at 2361-62, 147 L.Ed.2d 435 (quoting Jones v. United States, 526 U.S. 227, 248-49, 119 S.Ct. 1215, 1227, 143 L.Ed.2d 311 (1999)).
"`"....
"`"In United States v. Santiago, 268 F.3d 151 (2nd Cir.2001), the trial judge sentenced the defendant pursuant to a statute that required that the defendant have three prior convictions arising from offenses committed on different occasions. The defendant argued that the `prior conviction' exception does not encompass the question whether prior convictions arose from offenses committed on different occasions. The United States Court of Appeals for the Second Circuit rejected the defendant's argument, reasoning as follows:
"`"`In short, we read Apprendi as leaving to the judge, consistent with due process, the task of finding not only the mere fact of previous convictions but other related issues as well. Judges frequently must make factual determinations for sentencing, so it is hardly anomalous to require that they also determine the "who, what, when, and where" of a prior conviction.' "`"Id. at 156.
"`"Santiago reflects the general rule that the Almendarez-Torres exception covers questions related to recidivism, not merely the fact of prior conviction. Appellee's previous term of incarceration, like prior convictions arising from crimes committed on separate occasions, Santiago, 268 F.3d at 156, or the aggravated nature of a prior conviction, [United States v.] Becerra-Garcia, 28 Fed.Appx. 381, at 385 ... [(6th Cir.2002)], is a fact related to recidivism, and, as stated above, recidivism is a question that traditionally has been reserved for the sentencing court."
"`State v. Stewart, 368 Md. 26, 39-41, 791 A.2d 143, 151-52 (2002). We agree with the rationale and holding of the Stewart court. Whether at the time of the murders Stallworth was under a sentence of imprisonment because he was on probation for his prior conviction for assault in the third degree was a question related to Stallworth's prior conviction  a question for the trial court to resolve. Therefore, this aggravating circumstance was not subject to the holdings in Apprendi and Ring.'
"Stallworth, 868 So.2d at 1184-86.
"Recently, in Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), the Alabama Supreme Court recognized that Ring did not alter the exemption for the fact of a prior conviction; our supreme court stated:
"`In his special writing in Bottoson v. Moore, 833 So.2d 693, 719 (Fla.2002), Justice Pariente eloquently explained:
"`"[T]he presence of a prior violent felony conviction meets the threshold requirement of Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] as extended to capital sentencing by Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)]. In Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the United States Supreme Court approved an enhanced sentence for the crime of returning to the United States after being deported, based on the judge's finding that the deportation *436 was pursuant to three prior convictions of aggravated felonies. The Court rejected a claim that the enhancement was improper because the indictment had not alleged that the deportation was pursuant to the prior convictions. As explained in Apprendi, `our conclusion in Almendarez-Torres turned heavily upon the fact that the additional sentence to which defendant was subject was "the prior commission of a serious crime."' 530 U.S. at 488, 120 S.Ct. 2348. In Apprendi, the Court held:
"`"`[T]here is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.'
"`"Id. at 496, 120 S.Ct. 2348. Accordingly, the Court held: `Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' Id. at 490, 120 S.Ct. 2348 (emphasis supplied [in Bottoson]).
"`"In extending Apprendi to capital sentencing, the Court in Ring did not eliminate the `prior conviction' exception arising in Almendarez-Torres. The Court noted in Ring that `[n]o aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres.' 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4."
"`833 So.2d at 722-23 (footnote omitted). As was the circumstance in Bottoson, one of the aggravating circumstances presented by the State in the penalty phase of this trial involved a prior felony conviction; therefore, Smith is not entitled to relief pursuant to Ring. See Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).'
"Ex parte Smith, ___ So.2d at ___.
"In this case, one of the aggravating circumstances found by the trial court was that Moody had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The trial court's finding was based on Moody's prior convictions in federal court.... Because it was a finding of fact related to recidivism, the trial court's finding, as an aggravating circumstance, that Moody had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, ... was not subject to the holdings in Apprendi and Ring. Upon the trial court's making this finding, Moody became eligible for a sentence of death."
888 So.2d at 597-600 (footnotes omitted).
Similarly, one of the aggravating circumstances the trial court found to exist in this case was that Minor had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975; he had been convicted in 1992 for assault. The trial court's finding in this regard was not subject to the holding in Ring and was alone sufficient to make Minor eligible for the death penalty. Therefore, there was no violation of Ring in this case.

*437 VIII.
Minor contends that the aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses, is "unconstitutionally vague and overbroad"; that the trial court's instructions to the jury regarding the heinous, atrocious, or cruel aggravating circumstance "failed to channel and limit the sentencer's discretion sufficiently to minimize the risk of wholly arbitrary and capricious action"; that the trial court failed to make findings of fact regarding the heinous, atrocious, or cruel aggravating circumstance; and that the trial court's finding that the capital offense was heinous, atrocious, or cruel was arbitrary, capricious, and unsupported by the evidence. (Issue XI in Minor's brief at pp. 61-62.) Minor's challenge to the constitutionality of § 13A-5-49(8), to the trial court's jury instructions regarding the heinous, atrocious, or cruel aggravating circumstance, and to the trial court's alleged lack of factual findings regarding that circumstance were never presented to the trial court;[17] therefore, we review them for plain error. See Rule 45A, Ala.R.App.P.
With respect to Minor's constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).
With respect to Minor's challenge to the trial court's jury instructions on the heinous, atrocious, or cruel aggravating circumstance, the trial court instructed the jury as follows:
"Now, the State of Alabama alleges as one aggravating circumstance that the offense was especially heinous, atrocious or cruel compared to other capital offenses. The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"What is intended to be included in this aggravating circumstance [are] those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"A capital offense, to be especially heinous, atrocious or cruel, any brutality which is involved in it must exceed that which is normally present in any capital offense.
"For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim."
(R. 2534-35.) These instructions are substantially similar to those set out in the Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases *438 Tried Under Act No. 81-178. In addition, they are identical to the instructions given by the trial court during Minor's first trial, which this Court upheld in Minor, 780 So.2d at 790. We adhere to that holding. See also Stallworth v. State, 868 So.2d 1128, 1167-68 (Ala.Crim.App.2001); Broadnax v. State, 825 So.2d 134, 209-10 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); Smith v. State, 795 So.2d 788, 837 (Ala.Crim.App.2000); Hall v. State, 820 So.2d 113, 146-47 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001); Price v. State, 725 So.2d 1003, 1057-58 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998); and Knotts v. State, 686 So.2d 431, 446-47 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996) (all upholding instructions similar to the instructions in this case).
Minor's claim that the trial court failed to make factual findings regarding the heinous, atrocious, or cruel aggravating circumstance, is refuted by the record. In its sentencing order, the trial court made the following findings regarding this aggravating circumstance:
"In the case at bar, the defendant, on the evening of April 15, 1995, was left alone, in the apartment of Lakeisha Jennings, with the victim, who was the defendant's infant son. Upon returning home, Lakeisha Jennings noticed that the victim was not breathing. The infant was taken to the hospital where he died. An autopsy showed that many [of] the infant's ribs were broken, and his spleen and liver were lacerated. The victim's skull was fractured and brain tissue showed injuries consistent with shaken infant syndrome. Blood in the testicles showed injury there as well. Dr. Kenneth Warner, the forensic pathologist, testified that these injuries were the worst, non-automobile crash injuries he had ever seen in a child. Other physicians testified that these injuries were unusually severe. Almost all of the infant's blood was in the abdominal cavity and testicles; this fact indicated severe internal injuries. The broken bones were consistent with someone either stomping on the child or slamming his body against some hard object.
"The physicians testified that, undoubtedly, the baby experienced severe pain for a period of time prior to his death. The court finds that the State has proven, beyond a reasonable doubt, that compared to other capital murder cases, this murder was especially heinous, atrocious, and cruel, thereby constituting an aggravating circumstance, under Code of Alabama, § 13A-5-49(8)."
(C. 415.)
Finally, we find Minor's claim that the trial court's finding that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses was arbitrary and capricious, and so unsupported by the evidence as to be meritless.
The heinous, atrocious, or cruel aggravating circumstance "was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). In Ex parte Clark, 728 So.2d 1126 (Ala.1998), the Alabama Supreme Court explained:
"In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States held that the application of certain state death penalty statutes violated the Eighth Amendment to the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that those statutes' lack of principled standards to prevent the sentencing authority from arbitrarily and *439 capriciously imposing capital punishment rendered the application of the sentencing scheme constitutionally infirm. E.g., id. at 310, 92 S.Ct. 2726 (Stewart, J., concurring); id. at 311, 92 S.Ct. 2726 (White, J., concurring).
"Since Furman, many states have revised their death penalty statutes to require that the sentencing authority consider aggravating and mitigating circumstances, thus limiting the discretion of the sentencing authority. See Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court's post-Furman cases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a `principled way to distinguish' cases in which the death penalty is appropriate from cases in which it is not. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court has held that the `especially heinous, atrocious, or cruel' aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See Cartwright, 486 U.S. at 365-66, 108 S.Ct. 1853 (upholding the Oklahoma Court of Criminal Appeals' interpretation of the `especially heinous, atrocious, or cruel' aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
"In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. 1759). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added).
"....
"... The State urges us to hold that the `execution-style' murder in this case, for which the record does not reflect torture of the victim, is nonetheless `especially heinous, atrocious or cruel.' Such an expansion of the aggravating circumstance set out in § 13A-5-49(8) to encompass a murder not involving torture, merely because the State labels the murder an `execution-style' slaying would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance. Indeed, the Supreme Court of the United States has held that a state supreme court's failure to apply its previously recognized limiting construction of an aggravating circumstance, which required a finding of torture or aggravated battery of the victim, rendered the application of the aggravating circumstance unconstitutional. Godfrey, 446 U.S. at 429, 432, 100 S.Ct. 1759.

*440 "We cannot depart from the established meaning of the words enacted by the Legislature  `especially heinous, atrocious or cruel'  and apply those words to include murders that do not involve the infliction of torture on the victim. Such a departure would abandon the essential characteristic that made our previous applications of § 13A-5-49(8) compatible with the Eighth Amendment. We are bound to retain the interpretation of `especially heinous, atrocious or cruel' that has provided a consistent and principled distinction between those murders for which the death sentence is appropriate and those for which it is not. See Cartwright, 486 U.S. at 363, 108 S.Ct. 1853; Godfrey, 446 U.S. at 433, 100 S.Ct. 1759."
728 So.2d at 1137-41 (some emphasis in original; some emphasis added) (footnotes omitted).
In Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999), this Court recognized the following three factors as indicative that a crime is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim. As Ebious was only two months old, he was not sufficiently developed to suffer the psychological torture typically required under this factor. See Norris, 793 So.2d at 859-62, for an explanation of what constitutes psychological torture. However, the other two factors are present in this case.
In Norris, this Court explained those two factors as follows:
"One factor that is indicative of `especially heinous, atrocious, or cruel' is the infliction on the victim of physical violence beyond that necessary or sufficient to cause death. See generally Thomas M. Fleming, Annot., Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Heinous, Cruel, Depraved, or the Like  Post-Gregg Cases, 63 A.L.R.4th 478 (1988).
"`[The infliction of this kind of physical injury] may be accomplished either or both by subjecting the victim to injury of a different nature than, and in addition to, that proximately causing death, or by the repeated infliction of injuries of the same nature as that causing death, where at least some of the injurious acts are separated by a lapse of time sufficient enough to cause the victim prolonged suffering.... Such additional or repeated violence is often considered cruel ... where inflicted on a living and conscious victim....'
"Id. at § 2[a], p. 488.
"....
"However, ... (1) the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and (2) the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted.
"....
"Another factor to consider in determining whether this aggravating circumstance has been proven beyond a reasonable doubt is whether a victim experienced appreciable suffering after a swift assault that ultimately resulted in death.
"`Where the victim was not subjected before [or] contemporaneously with ... death to additional injury of a nature different than that causing death, or to repeated injuries of the same nature as that causing death *441 inflicted other than in rapid, uninterrupted succession, a principal focus of inquiry in determining whether the murder was especially heinous, cruel, depraved, or the like has been whether the victim lost consciousness or died instantaneously or quickly after the fatal attack, without time for appreciable suffering, or instead lost consciousness or died only after a lapse of time significant enough to permit such suffering.'
"Fleming, supra § 2[a], at 489."
793 So.2d at 854-59.
The evidence in this case indicates a vicious and barbaric attack on a two-month-old infant. The violence employed during that attack went far beyond that necessary to cause Ebious's death. Ebious was not only severely shaken for at least 15 to 30 seconds, but he also was savagely beaten as well. He had 24 rib fractures and a skull fracture; his left lung, his spleen, and his liver had been lacerated; he had blood in his chest and abdominal cavities as well as in his testicles; and he had severe brain trauma. Testimony indicated that it would have taken a tremendous amount of force to break Ebious's ribs and to cause the skull fracture because an infant's bones are very pliable and are softer than the bones of an adult and thus tend to bend rather than break. Three physicians testified that Ebious's injuries were the most severe they had ever seen in an infant, and testimony indicated that the injuries Ebious sustained normally occur only when an infant is thrown from a vehicle as the result of a high-speed collision. Thus, it is clear that the physical violence Minor inflicted on Ebious went far beyond that necessary or sufficient to cause death.
However, whether Ebious was conscious and aware during at least some part of the attack so that he experienced appreciable suffering is a closer question. In its sentencing order, the trial court stated, in part, "The physicians testified that, undoubtedly, the baby experienced severe pain for a period of time prior to his death." (C. 415.) This statement is not supported by the record. First, only one physician, Dr. Downs, testified regarding any pain that the injuries may have caused; none of the other physicians who testified were even questioned about possible pain and suffering. In addition, Dr. Downs's testimony was not so clear as to establish that "undoubtedly, the baby experienced severe pain for a period of time prior to his death" as the trial court stated in its order. (C. 415.)[18] Nevertheless, we find that a fair inference from Dr. Downs's testimony, as well as other evidence presented, was that Ebious did, in fact, suffer intense pain for a period of time before his death.
Dr. Downs testified that Ebious's injuries could all have been inflicted within a span of one minute, or they could have been inflicted over a period of up to an hour. When questioned on direct examination, Dr. Downs testified that the rib fractures (caused by the shaking) and the lacerations to the liver and spleen (most likely caused by blunt-force trauma to the *442 abdomen) would have caused "intense pain." (R. 1723.) Although the medical examiner testified that he could not determine in what order the injuries were inflicted, i.e., whether the skull fracture was the first injury or the last, Dr. Downs said that Ebious's brain tissue under the skull fracture was bruised, which indicated that Ebious had a blood pressure and was alive when the skull fracture was inflicted and lived for at least a short period thereafter. Moreover, the evidence indicated that at some point during or after the attack, Ebious vomited on his clothing, thus also suggesting that Ebious was alive during at least a portion of the attack. On cross-examination of Dr. Downs, the following then occurred:
"[Minor's counsel]: All right, sir. So, in other words, if the baby was  Particularly, you see with the severe head injuries, he could have been at least quasi-comatose, could he not?
"[Dr. Downs]: After sustaining the head injuries, yes sir.
"[Minor's counsel]: All right, sir. And if he was quasi-comatose, then he would not be exhibiting manifestations of pain and so forth from the ribs, would he?
"[Dr. Downs]: Assuming the head injuries occurred first and that the other injuries occurred following?
"[Minor's counsel]: Yes, sir.
"[Dr. Downs]: Once he is comatose, he wouldn't have the sensation of pain from the liver, from the adrenal, from the kidney, from the pancreas, from the testicles. However, during the course of that shaking process, those multiple rib fractures and the puncture of that lung would have happened at some point. So I can't say that wouldn't have been painful 
"[Minor's counsel]: Yes, sir.
"[Dr. Downs]:  there.
"[Minor's counsel]: Yes, sir.
"[Dr. Downs]: But the other, assuming that that was the one that occurred first, I couldn't say the other ones, if he was comatose, no, they wouldn't have been painful."
(R. 1761-62.) (Emphasis added.) Dr. Downs's testimony suggested that even if the skull fracture occurred first and immediately rendered Ebious comatose or quasi-comatose, Ebious could still have felt the intense pain from the ribs being fractured, although he would not have felt the pain from the injuries to his internal organs. See, e.g., Brown v. State, 663 So.2d 1028, 1034 (Ala.Crim.App.1995) (the especially heinous, atrocious, or cruel aggravating circumstance was supported by the medical examiner's testimony that "although the victim was unconscious he still would have been able to feel pain").
In addition, in his statement to police in which he claimed that he accidentally injured Ebious, Minor said that after he tripped and fell on top of Ebious, Ebious was crying; that he then picked Ebious up off the floor and checked to see if he was okay; that it was at that point that Ebious quit crying; and that he then shook Ebious and attempted to do chest compressions in an effort to resuscitate him. Although the jury obviously rejected Minor's claim that Ebious's injuries were accidental, it nevertheless could have believed that portion of Minor's statement indicating that Ebious was conscious, awake, and crying after the initial attack.
The medical testimony combined with Minor's statement to police and the evidence indicating that Ebious vomited at some point during or after the attack was minimally sufficient evidence from which the jury could have reasonably inferred that Ebious experienced appreciable suffering for a period of time before his *443 death. That Ebious could have suffered pain for a period before his death combined with the vicious nature of the attack, the severity of the injuries, and the sheer number of injuries clearly supports the trial court's finding that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. Thus, the trial court's finding in this regard was not arbitrary or capricious and was supported by the evidence.

IX.
Minor contends that his death sentence should be vacated because, he says, it is disproportionate to the sentences imposed in similar cases involving shaken baby syndrome in other jurisdictions. Because Minor did not raise this claim in the trial court, we review it for plain error. See Rule 45A, Ala.R.App.P.
Initially, we note that this type of comparative proportionality review is not constitutionally required. In Ex parte Barbour, 673 So.2d 473 (Ala.1995), the Alabama Supreme Court explained:
"Barbour argues that the Court of Criminal Appeals failed to consider whether the imposition of the death penalty was excessive or was disproportionate to sentences imposed in similar cases, as required by § 13A-5-53(b)(3), in that that court, in making its determination, failed to consider the capital cases that are settled in the circuit courts of this state by plea bargains and those in which defendants who plead guilty to conduct just as reprehensible as the conduct involved in this case do not receive the death penalty. In fact, Barbour argues that Christopher Hester, a co-defendant in this case and who Barbour says was a leader in the commission of the crime, was allowed to plead guilty to noncapital murder and was sentenced to life in prison with the possibility of parole. Therefore, Barbour argues that it is not just, and that it violates the constitutional rights of a capital murder defendant, for an appellate court to compare his conduct only with that of defendants in other cases that have been appealed because the defendant was not satisfied with the result. We cannot accept Barbour's argument. The Legislature, in adopting § 13A-5-53(b)(3), was attempting to follow the mandate of the United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), that appellate courts examine all death sentences to ascertain `whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant.' Beck v. State, 396 So.2d 645, 664 (Ala.1980). The United States Supreme Court, in a decision after Gregg, has held that comparative proportionality review is not constitutionally required in every state court death sentence review. Pulley v. Harris, 465 U.S. 37, 43-51, 104 S.Ct. 871, 875-80, 79 L.Ed.2d 29 (1984). In fact, the United States Supreme Court has specifically rejected the claim that a capital defendant can prove an Eighth Amendment violation `by demonstrating that other defendants who may be similarly situated did not receive the death penalty.' McCleskey v. Kemp, 481 U.S. 279, at 306-307, 107 S.Ct. 1756 at 1774-75, 95 L.Ed.2d 262 (1987)."
673 So.2d at 474.
"While a comparative proportionality review is not constitutionally required, § 13A-5-53(b)(3) requires one." Davis v. State, 718 So.2d 1148, 1163 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998). Nevertheless, even under § 13A-5-53(b), *444 this Court does not look to other jurisdictions to determine whether a death sentence is excessive or disproportionate. See, e.g., Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002) (refusing to conduct proportionality review by looking to other states). See also State v. Godsey, 60 S.W.3d 759, 786 (Tenn.2001) (holding that "out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review" based on Tennessee's capital statute which contains a provision similar to Alabama's requiring a comparative proportionality review of a death sentence).
As noted above, the purpose behind § 13A-5-53(b) is to ensure "that appellate courts examine all death sentences to ascertain `whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant.'" Ex parte Barbour, 673 So.2d at 474, quoting Beck v. State, 396 So.2d 645, 664 (Ala.1980) (emphasis added). Therefore, Minor's claim that his death sentence is disproportionate when compared to similar crimes in other jurisdictions is meritless.

X.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Minor's capital-murder conviction, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Minor's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Minor's capital-murder conviction, we also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Minor of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Minor to life *445 imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, as well as written findings of fact summarizing the offense and Minor's participation in it. The trial court also stated that it had considered the nonstatutory mitigating evidence offered by Minor pursuant § 13A-5-52, Ala.Code 1975.
In its findings, the trial court found the existence of two aggravating circumstances: (1) that Minor had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975, and (2) that the murder was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found two statutory mitigating circumstances to exist: (1) that Minor's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, see § 13A-5-51(6), Ala.Code 1975, and (2) that Minor was only 22 years old at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. The trial court also heard testimony regarding Minor's character and record and any of the circumstances of the offense that Minor offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found that the following evidence presented by Minor constituted nonstatutory mitigation: (1) that Minor came from a good family and did well in school until he dropped out in the 9th grade; (2) that Minor was well-mannered and respectful; (3) that Minor held various jobs starting when he was 17 years old; (4) that Minor had been hospitalized for drug problems; and (5) that Minor often helped his neighbors by cutting grass and running errands. The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Minor to death. We find no plain error or defect in the sentencing phase of the proceedings.[19]
However, with respect to the trial court's findings concerning the aggravating circumstances and the mitigating circumstances, we note that the trial court's sentencing order is virtually identical to the sentencing order from the first trial, despite the fact that the evidence presented at the second trial differed in many respects from the evidence presented at the first trial. In its order, the trial court refers to evidence that was never presented at the second trial, but was presented at the first trial. The trial court's reference *446 to extrinsic facts not presented at this trial was error. However, we find that the error was not prejudicial to Minor but was harmless.
As noted in Part VIII of this opinion, in finding that the crime was especially heinous, atrocious, or cruel, the trial court stated in its order that "[t]he physicians testified that, undoubtedly, the baby experienced severe pain for a period of time prior to his death." (C. 415.) Although clear and unequivocal testimony to that effect was presented at the first trial, the testimony presented at the second trial was not as clear as the trial court suggested in its order. However, as explained in Part VIII of this opinion, this error did not prejudice Minor because there was sufficient circumstantial evidence to support the application of the heinous, atrocious, or cruel aggravating circumstance. The trial court also stated in its order that "Dr. Kenneth Warner, the forensic pathologist, testified that these injuries were the worst, non-automobile crash injuries he had ever seen in a child." (C. 415.) Dr. Warner did not testify to this at the second trial. However, three other physicians testified at the second trial that Ebious's injuries were the most severe they had ever seen in an infant, and one of those physicians specifically testified that the type of injuries Ebious had would normally occur only as a result of being thrown from a car after a high-speed collision. Although the trial court attributed the testimony to the wrong physician, the testimony itself was presented and, thus, we find no prejudice to Minor from this error.
In addition, in finding that Minor's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, the trial court stated, in pertinent part, that "[t]he defendant had been drinking beer earlier in the day, but according to his testimony, he had sobered up enough to play basketball." (C. 416.) Although Minor testified during the penalty phase of the second trial, he did not testify about the circumstances of the crime or anything that occurred on the day of Ebious's death. The testimony to which the trial court referred is Minor's testimony during the guilt phase of his first trial. (Record from First Trial, R. 1225.) However, the trial court further stated in its order that "the defendant smoked a quantity of marijuana prior to the murder, and was undoubtedly under the influence of marijuana at the time of the crime." (C. 416.) Despite the trial court's reference to Minor's testimony from the first trial, the court still found that Minor's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the crime. Nothing in the record suggests that the court's reference to Minor's testimony from the first trial affected its weighing of the aggravating and mitigating circumstances or prejudiced its sentencing determination. Therefore, we find that the reference to this testimony in the sentencing order was harmless beyond a reasonable doubt. See, e.g., Jackson v. State, 791 So.2d 979, 1038-39 (Ala.Crim.App.2000), and Sockwell v. State, 675 So.2d 4, 30 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995).
Minor was convicted of the murder of a child less than 14 years of age. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(15), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001); Ward v. State, 814 So.2d *447 899 (Ala.Crim.App.2000); and Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998), aff'd, 746 So.2d 1042 (Ala.1999).
After carefully reviewing the record of the guilt phase and of the penalty phase of Minor's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The conclusions of the trial court are supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed, and Minor, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Minor's conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB and WISE, JJ., concur. BASCHAB, J., concurs in the result.
NOTES
[1] The record from Minor's first trial reflects that he also made statements on May 30 and May 31, 1995. See Hull v. State, 607 So.2d 369, 371 (Ala.Crim.App.1992)(this Court may take judicial notice of its own records). Those statements were not introduced at the second trial nor are they mentioned in the record of the second trial. Therefore, we do not consider the May statements in addressing this issue. However, we note that on appeal after his first trial, this Court held that the May statements were voluntary. See Minor, 780 So.2d at 729-32.
[2] Although not challenged on appeal, after reviewing the testimony presented at the suppression hearing as well as the testimony presented at trial regarding the statement, we find that the April 17 statement was voluntary and that it was properly admitted into evidence.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Minor does not argue on appeal that the April 16 statement was the product of custodial interrogation and that he was not properly advised of his Miranda rights. His sole argument is that his emotional condition at the time he made the statement rendered it involuntary. Nevertheless, we point out that the record clearly reflects that Minor was not under arrest when he made the statement; that he was not in custody at the time he made the statement; and that, contrary to his testimony at the suppression hearing, he was free to and, in fact, did leave after giving the statement. This statement was not the product of a custodial interrogation; it was the product of investigatory questioning. "The procedural safeguards outlined in Miranda do not apply to `traditional investigatory functions (such) as general on-the-scene questioning.'" Johnston v. State, 455 So.2d 152, 156 (Ala.Crim.App.1984), quoting Hall v. State, 399 So.2d 348 (Ala.Crim.App.1981). Therefore, Miranda warnings were not required. See, e.g., Powell v. State, 796 So.2d 404 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).
[5] The portion of the interview at the jail was audiotaped; we have listened to that tape. However, the audiotape was cut off  in the middle of a sentence by Inv. Bush, as a matter of fact  before the end of the interview at the jail. The tape does not include the statement by Minor asking Inv. Bush to contact his mother.
[6] The portion of the interview at the Tuscaloosa County Homicide Unit was videotaped and then transcribed. A copy of the transcript is included in the record on appeal.
[7] The record reflects that Minor had prior convictions.
[8] Moreover, we note that, even if the statement was not offered to show Minor's state of mind, but merely to show that Jackson had made a statement to police, the fact that Jackson had made a statement to police was, in fact, presented to the jury through Inv. Bush's testimony.
[9] Minor does not argue that the application of the Daubert standard should be extended beyond the admissibility of DNA evidence.
[10] The sixtieth day after sentencing was actually Saturday, May 26, 2001. However, pursuant to Rule 1.3(c), Ala.R.Crim.P., if the last day of a period is a Saturday, a Sunday, or a legal holiday, the period runs to the next day that is not a Saturday, Sunday, or a legal holiday, in this case, to Tuesday, May 29, 2001.
[11] In an order issued on June 25, 2004, we remanded this case for the trial court to determine whether the hearing on the motion for a new trial had been continued past the sixtieth day by express agreement of the parties. See Underwood v. State, 879 So.2d 611 (Ala.Crim.App.2003). On July 1, 2004, the trial court submitted an order stating that the hearing had not been continued by agreement past the sixtieth day.
[12] We also note that "`a condition to the granting of a new trial on the basis of newly discovered evidence is that the trial court must believe the evidence presented.'" Travis v. State, 776 So.2d 819, 847 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), quoting McMillian v. State, 594 So.2d 1253, 1264 (Ala.Crim.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). According to Minor, his expert would have testified that "Dr. Hardin's opinion has not and would not be accepted in the medical community." (Minor's brief at p. 17.) We find it extremely doubtful that such sweeping testimony would have been believed by the trial court, especially in light of the fact that Dr. Downs expressed the same opinion as Dr. Hardin with respect to hematocrit levels of children, thus affirmatively establishing that Dr. Hardin's opinion is, in fact, accepted by at least one other member of the medical community.
[13] According to Minor's brief, Prince is his half-brother.
[14] We note that the State argues in its brief that Minor's claim that juror Y.G. should have been removed from the jury should be reviewed under the plain-error rule because Minor never specifically requested at trial that juror Y.G. be removed. However, it is well settled that a "motion for mistrial will preserve for review lesser prayers for relief." Ex parte Marek, 556 So.2d 375, 379 (Ala.1989). Therefore, although Minor never specifically requested that juror Y.G. be removed, his motion for a mistrial necessarily encompassed that lesser prayer for relief.
[15] Some of the cases we have cited refer to "juror misconduct." In citing those cases, we do not wish to suggest that juror Y.G.'s actions were improper. Rather, we cite those cases to explain the standard for reviewing this issue. Juror Y.G. clearly did nothing wrong; there was no misconduct on her part. See, e.g., Ex parte Stewart, 659 So.2d 122 (Ala.1993).
[16] In his brief, Minor argues that the fact that juror Y.G. was aware that other members of the jury had noticed Minor's brother standing in the doorway to the courtroom affirmatively shows that she discussed Minor's brother with the other jurors despite her denial of such discussions. However, as is clearly seen by the above-quoted portion of the record, juror Y.G. explained that she knew the other jurors had noticed Minor's brother because one of the jurors had commented to her about him. Contrary to Minor's contention, nothing in the record suggests that juror Y.G. discussed the situation or the comments of Minor's brother in any detail with the other jurors.
[17] Although Minor objected to the trial court's instruction on the heinous, atrocious, or cruel aggravating circumstance, he did so on the ground that there was not sufficient evidence to warrant the instruction. He did not object to the adequacy of the instruction itself.
[18] We note that at the first trial the State did present such clear and unequivocal evidence. Specifically, the State presented testimony at the first trial from Dr. William Shamblin, one of the emergency-room physicians who treated Ebious at DCH. Dr. Shamblin specifically testified that "Ebious would have been in excruciating pain for at least 20 minutes and that the `shaking and damage to the head would probably not have caused unconsciousness too quickly, so Ebious would have been pretty well awake during most of the process.'" Minor, 780 So.2d at 789. However, the State failed to present this testimony or any testimony similar to it at the second trial.
[19] In light of the United States Supreme Court's opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), as part of our plain-error review, we have searched the record to determine if there is any inference that Minor is mentally retarded. See Ex parte Perkins, 851 So.2d 453 (Ala.2002), and Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2003). We have found no indication in the record that Minor is mentally retarded, even under the broadest definition of mental retardation. Therefore, the imposition of the death sentence in this case is not unconstitutional.